Public Utilities Commission
No. 80-390

APPEAL OF GRANITE STATE ELECTRIC COMPANY
(New Hampshire Public Utilities Commission)

September 16, 1981

*Orr & Reno P.A.*, of Concord (*Richard B. Couser* on the brief and orally), for Granite State Electric Company.

*Ransmeier & Spellman,* of Concord (*Michael Lenehan* on the brief and orally), for Newfound Hydroelectric Company, as amicus curiae.

*Robert H. Rowe,* of Milford, by brief and orally, for Franklin Falls Hydroelectric, Inc., as amicus curiae.

*Peter W. Brown* and *Robert A. Olson,* of Concord (*Mr. Brown & a.* on the brief and *Mr. Olson* orally), for Energy Law Institute.

DOUGLAS, J. Granite State Electric Company (Granite State) appeals an order of the public utilities commission (PUC) establishing a minimum rate at which it must purchase electric power from small power producers (SPP) of hydroelectric power over the life of their projects. Granite State challenges both the rate and the fact that the PUC set that rate as a minimum for the life of the power projects. We reverse and remand.

In 1978, the New Hampshire Legislature enacted the Limited Electrical Energy Producers Act (LEEPA), RSA ch. 362-A (Supp. 1979), "to provide for small scale diversified sources of supplemental electrical power to lessen the state's dependence upon other sources which may, from time to time, be uncertain." RSA 362-A:1 (Supp. 1979). That statute requires an electric utility, in certain circumstances, to purchase the entire output of electric power produced by a limited electrical energy producer, RSA 362-A:3 (Supp. 1979), at a rate set by the PUC. RSA 362-A:4 (Supp. 1979). That same year, the United States Congress enacted the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95–617, 92 Stat. 3117 (1978) (PURPA), which contained similar provisions requiring the Federal Energy Regulatory Commission (FERC) to prescribe rules to encourage, *inter alia,* small power production, including rules requiring electric utilities to purchase power from small power production facilities. PURPA § 210, 16 U.S.C.A. § 824a-3 (Supp. 1981).

On October 18, 1979, the PUC, pursuant to authority of RSA 362-A:4 (Supp. 1979) and PURPA § 210(f), 16 U.S.C.A. § 824a-3(f) (Supp. 1981), initiated hearings to determine the proper rate that an electric utility would be required to pay for energy produced by an SPP. Although LEEPA, RSA 362-A:4 (Supp. 1979), does not set standards for determination of that rate, PURPA does. PURPA § 210(b), 16 U.S.C.A. § 824a-3(b) (Supp. 1981), requires that, under FERC rules, the rates for purchases by electric utilities "shall be just and reasonable to the electric consumers of the electric utility and in the public interest" and shall not exceed "the incremental cost to the electric utility of alternative electric energy." "Incre-

mental cost of alternative electric energy" is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such . . . small power producer, such utility would generate or purchase from another source." PURPA § 210(d), 16 U.S.C.A. § 824a-3(d) (Supp. 1981).

The FERC rules implementing PURPA § 210 changed the term "incremental cost" to "avoided costs," 18 C.F.R. § 292.101(b)(6) (1980), and defined it to include "both the fixed and the running *costs* on an electric utility system which can be *avoided* by obtaining energy or capacity from qualifying facilities." 45 Fed. Reg. 12,216 (1980). (Emphasis added.) FERC classified costs as "energy" costs and "capacity" costs. *Id.* "Energy costs are the variable costs associated with the production of electric energy (kilowatt-hours). They represent the cost of fuel, and some operating and maintenance expenses. Capacity costs are the costs associated with providing the capability to deliver energy; they consist primarily of the capital costs of facilities." *Id.* FERC also determined that incremental costs, not average system costs, should be used to calculate avoided costs because, "[u]nder the principles of economic dispatch, utilities generally turn on last and turn off first their generating units with the highest running cost. At any given time, an economically dispatched utility can avoid operating its highest-cost units as a result of making a purchase from a qualifying facility." *Id.*

After six days of hearings, the PUC issued an order dated June 18, 1980, in which it rejected the utilities' position that avoided costs should be based solely on average fuel costs. The commission chose instead to follow the FERC concept of avoided costs. It adopted its staff's recommendation for a formula to arrive at avoided costs that included: base fuel cost; an "adder" for daily peak operation; a correction for forced outages; an inventory cost; and operation and maintenance expense; plus an added amount for capacity. Because precise data on all those costs were not available, the PUC used figures for Public Service Company of New Hampshire's (PSNH) newest oil-fired generating unit, Newington Station, as a "proxy," noting in its report that the parties "agreed" to the proxy. The PUC used that data to arrive at an avoided cost figure that rounded out to 8.2 cents per kilowatt-hour for all utilities except Granite State. Finding that Granite State had excess capacity, the PUC did not add the capacity component to that utility's costs and, accordingly, found its avoided costs to be 7.7 cents per kilowatt-hour, when rounded upward. Those rates were established as a minimum for the life of qualifying facilities, but the PUC indicated that it would consider future increases.

On July 14, 1980, Granite State filed a motion for rehearing on several grounds, including the assertions that the rate set for Granite State had no basis in the record and that the minimum rate for the lifetime of an SPP facility was unlawful. The PUC held oral argument on the motion, and Granite State advised the PUC that it had never agreed to the Newington proxy, offering to provide additional testimony to demonstrate that 7.7 cents per kilowatt-hour exceeded its avoided costs. The PUC issued a second order denying the motion for rehearing, rejecting the offer of additional testimony, and reaffirming the minimum lifetime rate on policy grounds. Granite State appealed to this court pursuant to RSA 541:6.

■■ Granite State argues that there is insufficient evidence in the record to support the PUC's determination of its avoided cost rate. It specifically claims that, because the rate was derived from figures for PSNH, there is no support in the record for applying those figures to Granite State. Under RSA 541:13, the PUC's findings are presumed reasonable and its order will not be overturned unless Granite State can show by a clear preponderance of the evidence that it is unjust or unreasonable. *Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977). One way that Granite State may meet its burden is by "showing that no evidence was presented in the record to sustain the order." *N.H.-Vt. Hosp. Serv. v. Whaland*, 114 N.H. 92, 96, 315 A.2d 191, 194 (1974). After reviewing the record, we conclude that Granite State has met its burden.

In its initial order setting avoided cost rates, the PUC presumed that all parties had agreed to the use of the Newington proxy, and it proceeded to arrive at a rate using Newington data. Granite State responded to that order by filing a motion for rehearing in which it informed the PUC that it had never agreed to the Newington proxy, arguing that its avoided cost rate should be based on figures for its own supplier, New England Power Company (NEPCO). The PUC did not acknowledge Granite State's allegation that it had not agreed to the proxy, but attempted to bolster its initial decision by the general assertion that "[s]pecific NEPCO data does exist in the record to sustain the Commission's application of the Newington data to NEPCO." In support of that statement, the PUC cited the fact that NEPCO and PSNH had "fairly close" estimates on how much oil prices will increase. That statement assumed that NEPCO's and PSNH's base fuel costs were the same. The PUC rejected Granite State's argument that NEPCO's oil prices are *lower* than PSNH's, relying on records that

allegedly showed that "the oil prices for the two companies continuously change as to which is more expensive." In fact, the document upon which the PUC relied shows that only *once* in a ten-month period was PSNH's cost of oil lower than NEPCO's.

The other evidence cited by the PUC is similarly unpersuasive. Essentially, the commission sought to support its application of PSNH data to Granite State by demonstrating that PSNH's cost figures were similar to those of NEPCO, Granite State's supplier. Even if that were true, the mere fact that two companies have similar costs is insufficient reason for applying the costs of one company to another, if data for both companies is available. There is no evidence that Granite State's cost figures were unavailable.

■ Neither the PUC nor any of the amici have been able to show specific evidence in the record to support the application of Newington data to Granite State, and we have been unable to find any. "It is not this court's function to comb lengthy and detailed administrative records in search of evidence which would support an administrative finding." *Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 759, 423 A.2d 603, 607 (1980).

■■ In its brief, the Energy Law Institute relies on voluminous documents from the PUC's files to support the PUC's action. None of that evidence, however, is in the record. Although the PUC may have been able to support its action by taking administrative notice of certain specified documents had it chosen to do so, *LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 351, 402 A.2d 626, 638 (1979), it was required to do so in a manner that afforded Granite State an opportunity to respond to the information contained in them. *See id.*, 402 A.2d at 638; *Insurance Serv. Office v. Whaland*, 117 N.H. 712, 720, 378 A.2d 743, 748 (1977). Because the record does not adequately support the application of Newington data to Granite State, the avoided cost rate for Granite State based on that data is without foundation. We therefore remand this case to the PUC to redetermine Granite State's avoided cost rate using figures that relate to that utility.

Granite State also argues that the PUC had no authority to establish a *minimum* avoided cost rate for the life of qualifying SPP facilities. We agree.

■ The PUC, as an administrative agency, must act within the scope of its delegated powers. *Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 689, 433 A.2d 1291, 1294 (1981). The commission derives its authority to set rates for the purchase of energy produced by SPP's from RSA 362-A:4 (Supp. 1979), which pro-

vides: "Public utilities purchasing electrical energy in accordance with the provisions of this chapter shall pay a price per kilowatt hour *to be set from time to time*, by the public utilities commission." (Emphasis added.) Pursuant to that authority, the PUC established a minimum rate for the *life* of an SPP facility, which Granite State argues could be fifty years. Concededly the phrase "from time to time" is not precise, but it clearly precludes the PUC from establishing such a permanent rate. In enacting the statute, the legislature was cognizant of the nature of rates and that conditions change so that "[a] rate desirable for one period of time may be undesirable for another period." K. DAVIS, ADMINISTRATIVE LAW TEXT § 18.08, at 368 (1972). Although the PUC justified the minimum lifetime rate on the ground that oil prices will *never* decrease, that rationale is pure speculation, though obviously of some self-evident attraction. Even if it were true, the PUC lacks authority under RSA 362-A:4 (Supp. 1979) to set an unmodifiable rate. The statute does not require the PUC to review rates at regular intervals, *cf. Diana Shoe Stores v. Dept. of Revenue*, 5 Ill. 2d 112, 115–16, 125 N.E.2d 71, 72–73 (1955), but it does require the commission to consider a rate change when conditions so warrant.

*Reversed and remanded.*

BATCHELDER, J., did not sit; the others concurred.