Merrimack
No. 81-067

# KENNETH D. BOEHNER & a.

v.

# THE STATE OF NEW HAMPSHIRE & a.

February 12, 1982

80

*James N. Sessler,* of Laconia, *Louie C. Elliott, Jr.,* of Newport, *Paul F. Cavanaugh,* of Concord, *David R. Connell,* of Portsmouth, and *William H. Hopkins,* of Plymouth (*Mr. Sessler & a.* on the brief, and *Mr. Elliott* and *Mr. Hopkins* orally), for the plaintiffs.

*Gregory H. Smith,* attorney general, *Walter L. Mitchell,* of Laconia, *Peter V. Millham,* of Laconia, *Anthony A. McManus,* of Dover, *George J. Falardeau,* of Tilton, *Robert W. Upton, II,* of Concord, *Roger G. Burlingame,* of Laconia, *Glenn G. Geiger, Jr.,* of Penacook, *Jon S. Auten,* of Newport, *Robert B. Buckley, Jr.,* of Claremont, and *Edward J. McDermott,* of Hampton (*Deborah J. Cooper,* deputy attorney general, *& a.* on the brief, and *Mr. Mitchell, Ms. Cooper,* and *Mr. Upton* orally), for the defendants.

BROCK, J. The issue in this case is whether the provisions of RSA ch. 502-A which provide that cities and towns in which a district court is actually located must bear all expenses associated with the operation of the court, without financial support from other communities served by the court, are constitutional.

Procedurally, this appeal involves a number of petitions for declaratory judgment brought under RSA 491:22 V which were consolidated for hearing. Various city officials and taxpayers filed the petitions, challenging the legality of the district court funding scheme adopted by the legislature in RSA ch. 502-A. After hearing, the Superior Court (*DiClerico,* J.) dismissed the petitions, and a notice of appeal was filed in this court. For the reasons which follow, we affirm the result reached below.

The district court system as it now exists in this State was established in 1963 when the legislature enacted RSA ch. 502-A, effective in 1964. Prior to 1964, each city or town with a population in excess of two thousand could have its own municipal court. *See* THE SIXTH REPORT OF THE JUDICIAL COUNCIL OF NEW HAMPSHIRE 13–14 (1956). Under that system, the courts were, in many instances, operating in inadequate facilities, disorganized and staffed by untrained personnel. *Id.* at 16. To correct these problems and

unify the municipal court system, the General Court, pursuant to powers granted it under N.H. CONST. pt. 2, art. 4, enacted RSA ch. 502-A.

In RSA ch. 502-A, the General Court established thirty-seven judicial districts, with each district having its own court. RSA 502-A:1. Since RSA ch. 502-A was first enacted, the number of judicial districts has been increased to forty-two. *See* RSA 502-A:1 (Supp. 1979) and Laws 1981, ch. 578 (adding the District of Pittsfield). Most districts consist of a number of neighboring communities with one of the towns or cities designated as the locus for the district court. *See* RSA 502-A:1. Although a city and several towns may be included in a district, only the city or town in which the court is regularly located is responsible for the salaries of the court's justices and clerks. RSA 502-A:6 (Supp. 1979). Other funding provisions within RSA ch. 502-A require that the "host" community provide the robes for the justices, RSA 502-A:23, and the court facility itself, RSA 502-A:31. There is no provision in RSA ch. 502-A requiring that any of the other communities within a district contribute to the court's operating costs.

A measure of compensation is afforded to the host communities under RSA 502-A:8 (Supp. 1979) for the financial burdens imposed upon them under other sections of the chapter. After deducting operating expenses, witness fees and other administrative charges from the fines and forfeitures paid into the district court, the clerk of the district court pays the balance to the treasurer of the host city or town. *Id.* The record before us is silent as to how successful this provision of the statute is in offsetting the host communities' court-related expenses. The plaintiffs, however, are all taxpayers or officials in six host communities—Claremont, Concord, Franklin, Laconia, Plymouth and Portsmouth—and they claim that, since 1978, the amount received from the court is not sufficient to offset the costs incurred by the host city or town in supporting the court. This, the plaintiffs argue, constitutes a violation of the constitutional guarantee of equal protection. U.S. CONST. amend. XIV; N.H. CONST. pt. 1, art. 1.

■ Before proceeding to the substantive aspects of this case, we first dispose of the defendants' claim that a declaratory judgment action under RSA 491:22 is an improper means of attacking the constitutionality of RSA ch. 502-A. Once again, we point out that "[f]or more than half a century pleading and procedure in this jurisdiction has been a means to an end and it should never become more important than the purpose which it seeks to accomplish." *Levitt v. Maynard*, 104 N.H. 243, 244, 182 A.2d 897,

898 (1962). Moreover, "[a] petition for a declaratory judgment is particularly appropriate to determine the constitutionality of a statute when the parties desire and the public need requires a speedy determination of important public interests involved therein." *Id.*, 182 A.2d at 898 (quoting *Chronicle &c. Pub. Co. v. Attorney General*, 94 N.H. 148, 150, 48 A.2d 478, 479–80 (1946)).

■ In this case the plaintiffs have alleged an economic harm and an erosion of the State constitutional guarantee that they need only contribute their fair share to the community's expense, N.H. CONST. pt. 1, art. 12, that those taxes must be proportional, N.H. CONST. pt. 2, art. 5, and that the singling out of host communities to pay for the district court's expenses further violates both State and Federal constitutional guarantees of equal protection. U.S. CONST. amend. XIV; N.H. CONST. pt. 1, art. 1. We therefore proceed to examine the propriety of the court's dismissal of the plaintiffs' petitions. On this appeal, we must assume the facts alleged in the plaintiffs' petitions to be true and construe all reasonable inferences therefrom in favor of the plaintiffs. *E.g., Kenneth E. Curran, Inc. v. Auclair Trans., Inc.*, 121 N.H. 451, 454, 531 A.2d 124, 126 (1981); *Morgenroth & Assoc's, Inc. v. Town of Tilton*, 121, N.H. 511, 519, 431 A.2d 770, 774 (1981).

■ In considering this equal protection challenge, we must first determine the appropriate standard of review: strict scrutiny; fair and substantial relationship; or rational basis. *See Carson v. Maurer*, 120 N.H. 925, 931–33, 424 A.2d 825, 830–31 (1980). The plaintiffs argue that, because specific State constitutional rights are being infringed, this court should utilize strict scrutiny as its standard of review. *See* N.H. CONST. pt. 1, art. 12; N.H. CONST. pt. 2, art. 5.

■■ Under both the Federal and State constitutions, equal protection analysis of statutes alleged to have had an adverse economic effect, absent a suspect classification, usually does not require application of the strict scrutiny standard. *New Orleans v. Dukes*, 427 U.S. 297 303 (1976); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 32–34 (1973); *Opinion of the Justices*, 117 N.H. 749, 757, 379 A.2d 782, 787 (1977).

We have also stated that:

> "The standard employed for review under the equal protection clause is similar to that of due process. Enactments that promote public health and safety and do not infringe on fundamental rights or create invidious classi-

fications are valid if rationally related to the state's interest."

*Opinion of the Justices*, 117 N.H. at 758, 379 A.2d at 788.

██ Assuming *arguendo* that the funding mandate of RSA ch. 502-A amounts to a de facto taxing measure, we note that the distinction that the legislature makes between host communities and other cities and towns within a district need only be a reasonable classification in order to withstand constitutional challenge. *See Opinion of the Justices*, 117 N.H. at 755–56, 379 A.2d at 786. Inasmuch as the constitution grants the legislature explicit authority to create the district courts, N.H. CONST. pt. II, art. 4, we conclude that it would be inappropriate for this court to employ the strict scrutiny standard, absent a showing of invidious discrimination. Accordingly, we will employ the rational basis test in evaluating the classification made by the legislature in RSA ch. 502-A.

█ The mandate imposed by the equal protection clauses of both the State and the Federal constitutions is that "those who are similarly situated be similarly treated." *Carson v. Maurer*, 120 N.H. at 931, 424 A.2d at 830. This, however, does not mean that mathematical equivalence is required. *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 668, 406 A.2d 704, 708 (1979).

█ Under the funding scheme enacted in RSA ch. 502-A for the district courts, the taxpayers of the host community alone bear the burden of supporting the court when the costs of operating the court exceed the amount of fines collected. This, the plaintiffs contend, means that they are treated differently from those other taxpayers in the district in which the court is located because those taxpayers do not have to contribute to the court's expense even though they are served by it. On its face, the funding scheme appears to result in dissimilar treatment. We therefore must determine whether the challenged classification rationally relates to a legitimate State interest. *Opinion of the Justices*, 117 N.H. 533, 537, 376 A.2d 118, 120 (1977).

█ Several reasons have been advanced in support of a determination that a rational basis exists for the manner by which the legislature has chosen to fund the district courts. One such reason is that the locus of the district court in the host community creates some advantages for the city or town which are not shared by the other towns in the district. The host community's police officers need travel only a minimal distance in order to prosecute their cases, thereby lessening the community's cost for travel reimburse-

ment. Further, the officers need not absent themselves from the community in order to attend trials. Thus, they are always able to respond immediately to an emergency. Similarly, when the court is in session, the presence of police officers from other towns contribute to an atmosphere of high police visibility that can only contribute to the overall security of the host community. In our opinion, the foregoing reasons, standing alone, provide a rational basis for the district court funding scheme adopted by the legislature.

It has also been suggested that, because the host communities tend to be the most populous in a district, most of the cases heard by the district court involve its residents. Therefore, if outlying communities had to contribute equally, host community residents would enjoy greater access to the court, occupy a greater percentage of the court's docket, and spend less for travel, while communities whose residents infrequently used the court would be subsidizing communities whose residents more frequently utilized its services. It is clear that many other economic advantages attend the location of a district court in a community.

██ ██ No one can doubt that with forty-two districts in the State, each district's experience with regard to funding will vary. That is not to say, however, that the legislature could not have felt that the provision of RSA 502-A:8 (Supp. 1979) which requires that the district court pay over the fines it collects to the host town would be sufficient to cover the district court's expenses. Indeed, our task is not to second-guess the legislature or question the factors which went into its decision. *See Carson v. Maurer*, 120 N.H. at 933, 424 A.2d at 831. We cannot say at this time, as a matter of law, that the district court funding mechanism contained in RSA ch. 502-A is "unreasonable or patently arbitrary," and we therefore find no violation of equal protection. *See Valley Bank v. State*, 115 N.H. 151, 155, 335 A.2d 652, 654 (1975).

██ The decision that we have reached today rests in large measure upon the premise that the legislature enjoys wide discretion in these areas and its enactments will not be found to violate equal protection "merely because the classifications made by its laws are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970); *Massachusetts Bd. of Retirement v. Murqia*, 427 U.S. 307, 316 (1976). On its face, RSA ch. 502-A appears to be a reasonable statute, and although the host community must finance the district court's operations, it also receives a portion of the fines assessed by the court while other towns in the district receive nothing. We will not overturn this funding provision at this time "because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S.

at 485. Furthermore, although the statute has been in effect since 1964, the plaintiffs' claim of inequality of financial burden under it apparently arose in 1978 at the earliest.

Current economic fluctuations, increasing court budgets, full-time judges with salaries incident thereto, and spiralling inflation can, however, convert a fluctuating short-term budgeting imbalance on the part of host communities into an irreversible trend.

We are not unmindful of the fact that the matter of equitable funding of our court system is presently under legislative consideration. *See Final Report of the Select Commission To Examine A Unified Court System* (March 10, 1981) and Laws 1981, ch. 562.

*Affirmed.*

BATCHELDER, J., did not sit; the others concurred.