Public Utilities Commission
No. 86-329

## APPEAL OF MARMAC & a.
### (New Hampshire Public Utilities Commission)

November 5, 1987

54

*Orr and Reno P.A.*, of Concord (*Howard M. Moffett* on the brief and orally), for the petitioners.

*Sulloway, Hollis and Soden*, of Concord (*Margaret H. Nelson* and *Robert H. Hafner* on the brief, and *Martin L. Gross* orally), for Public Service Company of New Hampshire.

THAYER, J. This is an appeal from decisions made by the New Hampshire Public Utilities Commission (PUC) in proceedings relating to the rates which Public Service Company of New Hampshire (PSNH) must pay small power producers (SPPs) for electrical energy. The two basic issues raised by petitioners are: (1) whether the PUC's statements, that it would annually update such rates, constitute binding "rules" under the New Hampshire Administrative Procedure Act (APA) which prevented the PUC from dismissing rate applications by the petitioner SPPs made prior to the one-year expiration date; and (2) whether the PUC denied the petitioner SPPs equal protection of the law by dis-

missing their applications but processing another SPP's application for existing rates.

We affirm the PUC's decisions and hold that its statements concerning annual rates were not rules as defined by the APA, RSA ch. 541-A, and that it did not deny the petitioners equal protection of the law.

The petitioners are Marmac, a California corporation, and its four New Hampshire subsidiaries and affiliates, which engage in developing energy projects in the State. These four subsidiaries are "small power producers" under section 1-a, VIII of RSA ch. 362-A (Limited Electrical Energy Producers Act). RSA 362-A:4 requires that, *inter alia*, public utilities purchase electrical energy from small power producers at the utility's "avoided cost," or the marginal cost that the utility would incur to generate or purchase the energy from another source.

In 1983, the PUC first set rates at which small power producers could supply electrical energy to PSNH. In its order setting the rates the PUC stated: "[i]t is intended that avoided cost data will be updated annually by the Company [PSNH] and reviewed by the Commission to determine the extent, if any, to which the rates should be revised . . . ." In a report dated September 5, 1985, the PUC reiterated its intention that long-term rates would be updated annually; in that report the commission also set long-term rates retroactive to June 21, 1985. It is petitioners' position that small power producers filing at any time during the annual period are entitled to the benefit of the long-term rates in effect for that period.

In December, 1985, the price of oil began to decline, reducing an important component of PSNH's avoided costs. On February 7, 1986, PSNH filed a "Petition for Comprehensive Avoided Cost Rate Proceeding," which sought, in part, an update of rates. The PUC responded by denying PSNH's update request, reiterating that "the commission has determined that long-term avoided cost rates are to be updated annually so that a predictable update mechanism can be fairly relied upon by all parties."

On March 18, 1986, PSNH filed a motion for rehearing. The PUC denied the motion, again stating that "it would be more appropriate to update the long term rates . . . during the next scheduled annual update due for effect in June, 1986, rather than doing it prematurely in this docket . . . ."

On April 15, 1986, PSNH filed another petition for an update of its avoided cost rate. On May 21, 1986, one month before the one-year anniversary date of the 1985 rates, the PUC, citing the fact

that declining fuel prices had rendered the updated long-term avoided cost rates significantly lower than the current rates, ordered an investigation into the long-term avoided cost rates proposed by PSNH's April 15 petition. The PUC also determined that, pending completion of its investigation, it would neither accept nor approve any long-term rate filings which were based on June 1985 rates and filed after May 21, 1986.

Two of Marmac's subsidiaries filed for long-term rates on May 26 and June 4, 1986. The PUC denied these rate applications. On June 13, Marmac and the four subsidiaries filed a motion to intervene in order to ascertain the effect of the May 21 termination of long-term rate applications, as well as the status of long-term rate applications filed between May 21, 1986, and June 20, 1986. A hearing was held on June 17, 1986, at which time the PUC allowed Marmac and the subsidiaries to intervene. On June 20, the PUC received motions for rehearing from the two Marmac subsidiaries whose long-term rate applications for the June, 1985, rates had been refused. The two other Marmac subsidiaries filed long-term rate applications on June 20, 1986. The PUC rejected these two filings on June 27, 1986. On July 10, 1986, the PUC issued a report and order that denied the petitioners' motions for rehearing, closed the dockets on the proceedings in which Marmac's four subsidiaries had filed for long-term rate applications, and reduced the rates available to SPPs. This appeal ensued.

In addition to the above chronology involving the petitioners and the PUC, an additional proceeding involving a non-appealing SPP is also relevant. In 1984, New England Alternate Fuels, Inc. (NEAF), an SPP with a project in Swanzey, obtained interim rates, for a contemplated project commencement date of 1986. On May 14, 1986, seven days before the start of the rate moratorium, NEAF petitioned the PUC, seeking a revised on-line date of 1988. The PUC initially responded by stating that rates beginning in 1988 were not available pursuant to the original order. However, on May 29, 1986, the PUC allowed NEAF to amend its petition in order to file for the rates available prior to the May 21, 1986, cut-off date.

The first issue we address is whether the PUC statements are "rules." This issue focuses on the characterization of the PUC's initial statement that "[i]t is intended that avoided cost data will be updated annually by the company and reviewed by the commission to determine the extent, if any, to which the rates should be revised," and the PUC's subsequent reiterations of that statement. The petitioners assert that the commission's determination that rates were to be reevaluated every year was, in substance,

a "rule" requiring compliance with RSA 541-A:3. We hold that these statements were not adopted as binding rules and are not enforceable as such, and that the PUC need not conform, therefore, to RSA 541-A:3 in updating the long-term rates.

The petitioners' brief cites the APA's definition of "rule," RSA 541-A:1, XIII, but does not explain how the PUC's statements conformed to that definition. Instead, the petitioners make a procedural argument, pointing out that the statements at issue were made after proceedings involving such standard rule-making procedures as notice and comment, and arguing that, consequently, the PUC's representations were rules, which could not be suspended without complying with the procedures for suspending or rescinding rules.

We are not unmindful that the PUC's pronouncements could reasonably be expected to foster an SPP's reliance. The question is whether the specific relief requested, namely, a holding that the PUC makes a rule whenever it employs one or more rule-making procedures, is appropriate from the standpoint of the long-term relationship of State agencies and regulated parties.

■ The language of RSA 541-A:3 only creates an enforceable rule when the agency has promulgated the rule in the manner prescribed by that section. RSA 541-A:3 is a full compliance regime for those areas in which a rule must or may be promulgated. *See* RSA 541-A:2, II (Supp. 1986). An agency decree, pronouncement, statement, etc., only becomes a rule when it has formally met all the requisites of RSA 541-A:3, including filing with the director of legislative services.

■ The PUC has broad powers to establish and implement rates at which regulated electric companies may purchase power from qualifying small power producers under 16 U.S.C. § 824a-3 (Public Utility Regulatory Policies Act, PURPA) and RSA ch. 362-A (New Hampshire Limited Electrical Energy Producers Act, LEEPA). The power granted to the PUC by these statutes and the Federal Energy Regulatory Commission (FERC) does not require that the appropriate State regulatory agency, in this case the PUC, implement rates in any particular manner. Instead, FERC has stated that "implementation may consist of the issuance of regulations . . . or any other action reasonably designed to implement" FERC's directives. 18 C.F.R. § 292.401(a). A review of PUC orders and implementations of long-term rates shows that the PUC did not make rate determinations using the rule-making procedures

required by RSA 541-A:3, but rather complied with RSA 541-A:2, II (Supp. 1986).

The rigidity in the rule-making procedure is an important positive aspect of rule-making, because regulated parties know exactly which agency directives are rules, and what they must do in order to comply with them. The petitioners' argument, if accepted, would require us to vitiate the pristine nature of rule-making procedures. In the petitioners' scheme of rule-making, the current clear dividing line between rules and non-rules would be eliminated. Regulated parties would have far less certainty as to what constitutes a "rule" than they do now.

■■■ For the above reasons, we must reject the petitioners' contention that the PUC's statements constituted rules. Since the rate statements at issue cannot be considered rules, the PUC is not bound to maintain the stated rates for a one-year period. Additionally, to maintain rates for an arbitrary one-year period would do violence to the standards set forth by both LEEPA and PURPA, which require that the rates be set based on the purchasing utility's avoided costs. The policy behind PURPA and LEEPA is (1) to encourage economically feasible small power producers, *i.e.*, those which can produce energy below the incremental cost at which the purchasing utility would be able to produce it, *see* 18 C.F.R. § 292.101(b)(6), and (2) to provide reasonable prices to the purchasing utility and hence, the ratepaying public. A steep decrease in oil prices seriously affected the avoided costs of PSNH, so that the 1985 rates that petitioners requested were no longer lower than the utility's avoided costs.

The petitioners' second argument rests on the fact that the commission permitted another small power producer, NEAF-Swanzey, to file for long-term rates after the May 21 cut-off date. The petitioners assert that by allowing NEAF's application, the PUC failed to treat all applicants in an even-handed manner, and thus denied petitioners equal protection of the law.

■ The first question in an equal protection analysis is whether the State action in question treats similarly situated persons differently. *See Gazzola v. Clements*, 120 N.H. 25, 29, 411 A.2d 147, 151 (1980). We are not certain that petitioners and NEAF were in fact similarly situated. Although Marmac's subsidiaries and NEAF are both small power producers, a significant difference existed in the procedural status of their long-term rate filings. In March, 1984, NEAF filed a petition for a twenty-year long-term rate to commence in 1986. The commission approved NEAF's petition. On

May 14, 1986, however, NEAF petitioned the PUC for a clarification, requesting that NEAF be allowed to commence delivery of electricity in 1988, instead of 1986, and that the rate be in effect for eighteen years, instead of twenty years. On May 29, 1986, two days after the cut-off for long-term rate filings, the commission denied NEAF's motion to change the rate dates, but did permit NEAF to amend its petition in order to apply for a long-term rate at 1985 levels. It is this amendment that the petitioners find offensive.

The petitioners, on the other hand, filed a completely new petition for long-term rates, not an amendment of an earlier petition. It is questionable, then, that NEAF and the petitioners are indeed similarly situated. The crucial distinction, however, is that the commission's allowance of a long-term rate filing by NEAF was an amendment of an earlier, timely filed petition for long-term rates. Even if we considered the petitioners and NEAF to be similarly situated, however, there is no fundamental right to be permitted to supply energy, and energy producers are not a suspect class. Consequently, we will uphold the action in question if a rational basis exists for the commission's decision to treat petitioners and NEAF as it did. *See Boehner v. State*, 122 N.H. 79, 83, 441 A.2d 1146, 1148 (1982); *Opinion of the Justices*, 117 N.H. 749, 758, 379 A.2d 782, 788 (1977).

Our above discussion presages the rational basis analysis. The procedural differences between the filings by the petitioners and NEAF afforded a rational basis for the commission to dismiss petitioners' applications and allow NEAF's. The commission could reasonably conclude that NEAF should be allowed to apply for a long-term rate in order not to terminate unfairly NEAF's application process, a process that had commenced before the rate application filing cut-off date.

*Affirmed.*

All concurred.