Public Utilities Commission
No. 87-008

### APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
(New Hampshire Public Utilities Commission)

January 29, 1988

*Sulloway, Hollis & Soden*, of Concord (*Margaret H. Nelson* on the brief and orally), for Public Service Company of New Hampshire.

*Rath and Young P.A.*, of Concord, and *Brown, Olson & Wilson*, of Concord (*Thomas D. Rath & a.* on the brief, and *Mr. Rath* orally), for Wormser Engineering, Inc. and Martin Energy, Inc.

BATCHELDER, J. Public Service Company of New Hampshire (PSNH) appeals an order of the public utilities commission (PUC or commission) granting Wormser Engineering, Inc. and Martin Energy, Inc. (Wormser) long-term rates at which PSNH must purchase power from an electrical generating facility to be developed by Wormser. For the reasons that follow, we affirm.

In a rare instance of State and federal legislative coincidence, the New Hampshire Legislature and the United States Congress each enacted similar provisions in 1978 designed to diversify electrical power production through the encouragement of small power producers and cogenerators. In New Hampshire, the Limited Electrical Energy Producers Act (LEEPA), RSA ch. 362-A, sought through diversification "to lessen the state's dependence upon other sources which may, from time to time, be uncertain." RSA 362-A:1. LEEPA "requires an electric utility, in certain circumstances, to purchase the entire output of electric power produced by a limited electrical energy producer at a rate set by the PUC." *Appeal of Granite State Elec. Co.*, 121 N.H. 787, 789, 435 A.2d 119, 119–20 (1981) (citations omitted). At the federal level, the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95–617, 92 Stat. 3117 (1978) (PURPA), embodied a similar policy, and required the Federal Energy Regulatory Commission (FERC) "to prescribe rules to encourage, *inter alia*, small power production, including rules requiring electric utilities to purchase power from small power production facilities." *Appeal of Granite State Elec. Co.*, 121 N.H. at 789, 435 A.2d at 120 (citing PURPA § 210, 16 U.S.C.A. § 824a-3 (Supp. 1981)).

In July 1984, pursuant to its authority under PURPA and LEEPA, the PUC, in Docket DE 83-62, Report and Supplemental Order No. 17,104, established and updated both the short- and long-term rates to be paid by PSNH to small power producers and cogenerators and the methodology to be used in calculating such rates. Based in part upon stipulations entered into by PSNH and a number of small power producers, the PUC set the rate schedule for all rate requests filed while the DE 83-62 rates remained in effect. Among other features of the DE 83-62 methodology was agreement by the small power producers to be obligated to deliver

power for the term specified in the rate request, while PSNH was permitted to file annual requests to update and revise the rates based on changes in its avoided cost data with respect to future contracts. In this context, "avoided cost" equals the "marginal cost that the utility would incur to generate or purchase the energy from another source." *Appeal of Marmac*, 130 N.H. 53, 55, 534 A.2d 710, 711 (1987); *see also* 18 C.F.R. § 292.101(b)(6) (1985) ("incremental costs to an electric utility of electric energy . . . which, but for the purchase from the [small power producer or cogenerator], such utility would generate itself or purchase from another source").

PSNH filed a request for an update of rates in June, 1985. In September, 1985, following a series of hearings in DR 85-215, the PUC set a revised rate schedule, retroactive to June 21, 1985, for all rate requests filed while DR 85-215 remained in effect. On January 6, 1986, Wormser filed a petition with the PUC in accordance with DE 83-62 and DR 85-215, accompanied by a signed interconnection agreement, for a front-end loaded (or levelized) twenty (20) year rate order for its proposed cogeneration project. The PUC opened Docket No. DR 86-1, and held a series of hearings throughout 1986 to consider the Wormser application.

Meanwhile, on February 7, 1986, PSNH filed a petition for comprehensive review of the methodology and procedures set forth in DE 83-62. This petition was brought as a result of a sharp and unanticipated decline in the price of oil, which resulted in a decrease in PSNH's actual avoided costs. PSNH was denied a temporary suspension of DR 85-215 rate requests, and was later denied a motion for interim rates pending PUC consideration of the review request. On April 15, PSNH filed another petition for an update of its avoided cost data, and in May, the PUC placed a moratorium on long-term rate petitions under DR 85-215 pending its inquiry into PSNH's April 15 request. *See Appeal of Marmac*, 130 N.H. at 56, 534 A.2d at 712.

In its January 6, 1986 application, Wormser sought a front-end loaded, twenty (20) year rate order for its 20-megawatt fluidized bed coal combustion (FBC) technology facility, to be developed in Rochester by Wormser Engineering, Inc. and Martin Energy, Inc. as a joint venture. The facility is designed to produce steam to be used in part for sale to the neighboring Spaulding Fibre plant, and in part to generate electricity to be sold to PSNH. Under a front-end loaded rate structure, Wormser would receive rates that in the first years of the project would exceed PSNH's avoided costs and in the later years of the front-end loaded rates would be lower than those costs. The net present value over the 20-year period would

be equal to the net present value of the rates available under DR 85-215.

The issues in dispute at the hearings were examined in detail by the PUC. They involved "the timeliness of the rate filing and . . . the eligibility of the project for front-end loaded or levelized rates." DR 86-1, Report and Second Supplemental Order No. 18,460, at 11 (October 29, 1986). The timeliness issue was whether the project had reached such a stage that the rate filing was not premature. The PUC found that Wormser had "demonstrated that its project reached the development stage where it qualifies for a long-term rate order under DR 85-215." The PUC found that Wormser had acquired sufficient, though not all necessary, federal, State, and local permits for construction and operation. In addition, the PUC found that Wormser's project design and construction planning had advanced to a stage where "not-to-exceed" construction quotations had been provided by reliable design and construction firms. Wormser had secured property rights to the project site, and a steam sales contract with Spaulding Fibre had been executed. Finally, the PUC concluded that financing arrangements had sufficiently progressed to warrant the granting of a rate order.

In terms of eligibility, the PUC examined, pursuant to the DE 83-62 methodology, the economic, technical, and operational viability of the proposed cogeneration facility. This inquiry required an assessment of the risks associated with new technologies such as FBC, and a balancing of the risks posed to the ratepayers by the use of front-end loaded rates with the benefits to be derived from developing the project. The PUC considered Wormser's operational experience with the FBC technology and determined that front-end loading of rates for the proposed 20-megawatt project should be limited to an amount consistent with full levelization for a smaller, 9-megawatt plant with which Wormser had more experience. According to the record, the proposed FBC technology was operational in only one other plant in the United States, a 9-megawatt plant owner by Wormser. This rate design would, in the opinion of the PUC, benefit ratepayers "through a lower total net present value" than that assumed for a 20-megawatt project under the DR 85-215 rates.

As additional security to ensure repayment to PSNH of the front-end loaded portion of the rates, the PUC accepted Wormser's offer to include a junior lien on the project in favor of PSNH. In addition, Wormser would maintain a reserve fund to be used to meet any cash deficiencies in project operation and to provide for extraordinary repairs.

Although the PUC ultimately denied the original rate petition, it permitted Wormser to amend its request to conform to one of three available rate structures:

"1. A 20 year long-term levelized rate for a 9 mw project;

2. A non-levelized rate for a 20 mw project; or

3. A 20 year long-term rate for a 20 mw project incorporating an amount of front-end loading not to exceed the dollar amount of front-end loading represented by a 9 mw project and a net present value less than that available pursuant to DR 85-215."

On November 18, 1986, PSNH filed a motion for rehearing and clarification which the commission subsequently denied. DR 86-1, Order No. 18,503 (December 10, 1986). Wormser then submitted an amended petition, before PSNH took this appeal, for a long-term rate in accordance with option 3. On February 19, 1987, the PUC approved the amended petition, the interconnection agreement, and the rates as set forth in the long-term worksheets submitted by Wormser. The PUC found specifically with respect to the amended petition that the amount of front-end loading for the proposed 20-megawatt project does not exceed the amount of front-end loading represented by a 9-megawatt project, and that the net present value is less than that available under DR 85-215. Furthermore, the PUC found that "the discount proposed by Wormser is sufficient in its judgment to offset the additional risk imposed by a 20 mw project in contrast to a 9 mw project." DR 86-1, Order No. 18,576, at 2 (February 19, 1987).

PSNH argues that the PUC erred as a matter of law in authorizing long-term rates based upon the DR 85-215 rate level, since PURPA and LEEPA permit a regulatory agency to authorize only those small power producer rates which do not exceed a utility's avoided cost. In support of this position, PSNH asserts that where it presented uncontradicted testimony that the DR 85-215 rates no longer properly reflected its avoided costs, the PUC committed error in allowing Wormser to receive long-term rates based upon the DR 85-215 rate level. PSNH argues, further, that the PUC's adherence to the position that the time of filing of a rate petition governs the applicability of the available rates indicates a misunderstanding of the doctrine of vested rights as developed by this court. PSNH argues in this regard that Wormser had only the right to apply for long-term rates, and not a right to receive rates which do not properly reflect PSNH's avoided costs. Wormser, according to PSNH, would only be entitled to those rates if it had

taken action in detrimental reliance upon a permit or license received from the PUC. Finally, PSNH argues that the legal error is not rendered harmless by the PUC's decision to grant Wormser long-term rates lower than what it had originally sought, since the amended long-term rates are also based on DR 85-215, and as such exceed PSNH's avoided costs.

Wormser counters that under PURPA and LEEPA, the PUC has the authority to grant qualifying facilities the rate in effect at the time of the filing of the petition. Wormser argues that since the PUC found that Wormser's petition was timely and met the eligibility requirements, it qualified for the applicable rates at the time of the filing. This conclusion, according to Wormser, is supported by the language of RSA 362-A:4 and certain FERC rules promulgated under section 210 of PURPA. Wormser argues, moreover, that PSNH had specifically agreed in the DE 83-62 stipulations to the PUC practice of granting the long-term rate in effect at the time of filing.

■■ PSNH carries the burden of showing that the PUC's decision to grant long-term rates arguably in excess of avoided costs is unlawful. RSA 541:13. We will not reverse the PUC's decision absent such a showing. *Appeal of Concord Natural Gas. Corp.*, 121 N.H. 685, 692, 433 A.2d 1291, 1296 (1981). The precise issue here is the scope of PUC authority under PURPA and LEEPA. As we have held in the past, the PUC's authority is that which is "expressly granted or fairly implied by statute." *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062; 1066, 454 A.2d 435, 437 (1982). We hold that the commission's granting of long-term rates to Wormser was not unlawful, as it was within the scope of the PUC's authority under PURPA and LEEPA.

Section 210 of PURPA, 16 U.S.C.A. § 824a-3, directs the FERC to promulgate rules for implementation by State regulatory commissions. 16 U.S.C.A. § 824a-3(f)(1). Among other things, the FERC authorized the State commissions to grant to qualifying facilities (small power producers and cogenerators) the option to obtain rates for purchases pursuant to a legally enforceable obligation for delivery over a specified term on the basis of either:

"(i) the avoided costs calculated at the time of delivery; or

(ii) the avoided costs *calculated at the time the obligation is incurred.*"

18 C.F.R. § 292.304(d)(2)(i) and (ii) (1980) (emphasis added).

The regulations provide further that estimated avoided costs may be calculated at the time a qualifying facility agrees to be obligated to the delivery of power for a specific term. The FERC has said:

> "In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery."

18 C.F.R. § 292.304(b)(5).

██ The PUC's articulated policy is to treat the filing of a rate petition accompanied by an interconnection agreement signed by the small power producer as a legally enforceable obligation. This is consistent with subsection (ii) of 18 C.F.R. § 292.304(d)(2). Moreover, the PUC has previously held that a developer is entitled to the rates set forth by the PUC if the long-term rate petition satisfies the required conditions for qualification. *Re Concord Regional Waste/Energy Company*, Docket No. DR 85-223, Report and Order No. 17,829 (August 23, 1985). This is consistent with PURPA and the FERC rules as explained in the comments to 18 C.F.R. § 292.304(b)(5) and (d):

> "Paragraphs (b)(5) and (d) are intended to reconcile the requirement that the rates for purchases equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future avoided costs."

45 Fed. Reg. 12,224 (1980).

PSNH argues that if the avoided cost of energy at the time it is supplied is less than the price provided in the contract or obligation, then PSNH would be required to pay a rate for purchases that would subsidize the cogenerator or small power producer at the expense of PSNH's ratepayers. However, the FERC has specifically addressed this concern:

> "The Commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. The Commission does not believe that the reference in the statute to the incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked

against rates established in long-term contracts between qualifying facilities and electric utilities."

*Id.*

The FERC was of the opinion that overestimations and underestimations in avoided costs would balance out over the long run. Moreover, the FERC recognized a need for certainty with regard to return on investment in the fledgling technologies, stating that the import of paragraphs (b)(5) and (d) is to promote that certainty by assuring a qualifying facility the benefit of its commitment. *Id.*

■ In implementing PURPA's policy of encouraging the development of new technologies, the FERC has recognized that investors must be able to estimate the expected return on their investment with reasonable certainty *before* the development of a qualifying facility. The PUC practice of granting a long-term rate to a cogenerator based on the rate schedule in effect at the time of filing the rate petition is consistent with the FERC policies and rules. Thus, the PUC had authority under PURPA to grant a long-term rate order to Wormser, even though the rates may have been in excess of PSNH's estimated avoided costs.

Similarly, the PUC had authority under LEEPA to grant such rates. Under RSA 362-A:4, the PUC is permitted to set long-term rates which shall, at the option of the qualifying facility, "be based on the puchasing utility's avoided costs either [1] calculated for the time of delivery or [2] *calculated for a specified term at the time the [qualifying facility] agrees to be obligated to delivery for the specified term.*" (Emphasis added.) As noted above, the PUC has stated that a qualifying facility agrees to be obligated to delivery of power for the specified term at the time of its rate filing, if it files a timely and eligible rate petition accompanied by a signed interconnection agreement. As will be discussed later in this opinion, the PUC found that Wormser had met these conditions and was therefore entitled to a long-term rate order under DR 85-215.

This conclusion is consistent with our decision in *Appeal of Marmac*, 130 N.H. at 59, 534 A.2d at 714, where we concluded that a small power producer that filed a rate petition after the date of a moratorium placed by the PUC on rate petitions filed pursuant to DR 85-215 was not entitled to a long-term rate order under the DR 85-215 rate structure. In our discussion in *Marmac*, we tacitly recognized the PUC practice of granting rates that are in effect at the time of the filing. In that case, we compared the rate petitions of the Marmac subsidiaries with that of New England Alternate Fuels, Inc. (NEAF). We found no equal protection violation where

NEAF was granted a DR 85-215 rate based on a filing *before* the May 21, 1985 moratorium date, and where Marmac was denied such a rate based on a filing *after* the moratorium date. *See Marmac, supra* at 59, 534 A.2d at 714.

PSNH argues, further, that the granting of the rate order was based on an erroneous implicit assumption that Wormser had a vested right to a DR 85-215 rate order. PSNH argues that the PUC apparently misunderstood the doctrine of vested rights as developed by this court. *See generally Socha v. Manchester,* 126 N.H. 289, 291, 490 A.2d 794, 795 (1985) (detrimental reliance upon outstanding permit or license). This vested rights argument is, in our view, inapposite. The PUC granted the rate order based on the DR 85-215 rates consistent with its prior practices, and because Wormser qualified for such a rate order. The PUC had authority to grant the order, and whether Wormser had a vested right to such a rate order is simply not relevant.

PSNH next argues that the PUC order granting long-term levelized rates was unreasonable in light of the commission's findings regarding the technical and financial vulnerability of the project. PSNH alleges that since the PUC found that Wormser had not obtained all necessary permits, had not entered into contracts for the construction and operation of the facility, and had not acquired the necessary financing, the petition for a long-term rate order was premature. In addition, PSNH argues that the FBC technology is relatively untried and poses significant risks to ratepayers. PSNH also questions what it perceives as an overly optimistic financial analysis based on an unrealistic availability factor of 88%; *i.e.,* the plant would produce power 88% of the time. The financial analysis, according to PSNH, revealed instability in the later years of the project to the extent that PSNH and its ratepayers would not receive compensation for having, in effect, extended a loan to Wormser in the early years through front-end loading. PSNH argues further that the devices implemented to protect PSNH and its customers against the project's vulnerability did not result in a just and reasonable rate.

Wormser contends, on the other hand, that the PUC properly found that Wormser met the necessary conditions for a long-term rate order under DE 83-62 and DR 85-215. Wormser argues that it met the conditions of timeliness and eligibility sufficiently to warrant the granting of a long-term rate order. In addition, Wormser argues that the PUC properly balanced the uncertainties and advantages of the FBC technology with the risks posed to ratepayers. Wormser also argues that the PUC properly designed

limitations on the rate structure, and imposed additional mechanisms to protect PSNH and ratepayer exposure.

■■ This court will not reverse a decision of the PUC, except for errors of law, unless the appealing party demonstrates by a clear preponderance of the evidence that the order was unjust or unreasonable. RSA 541:13; *Appeal of Conservation Law Foundation*, 127 N.H. 606, 615, 507 A.2d 652, 658 (1986); *Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977). Moreover, the findings of the PUC are deemed *prima facie* lawful and reasonable. RSA 541:13; *Appeal of Pierce*, 122 N.H. 762, 765, 451 A.2d 363, 365 (1982).

The PUC has established an analytical framework for determining whether a small power producer or cogenerator qualifies for a front-end loaded, long-term rate order. First, the rate petition must be timely; that is, there has been a demonstration that most of the developmental problems have been resolved, giving rise to a reasonable expectation that the project will be on-line on the date specified in the rate filing. Docket No. DR 86-41, Report and Supplemental Order No. 18,260, at 11 (May 19, 1986). Second, the cogenerator must demonstrate its eligibility. A project is eligible for a long-term rate order if it can demonstrate that it is economically viable over the life of the project. This inquiry entails, among other things, a balancing of the risks posed to ratepayers by technical and financial uncertainties.

With respect to the timeliness component, the PUC found, as we discussed above, that the critical permits had been obtained by Wormser and other preliminary obstacles had been overcome. The PUC found that Wormser had received, among other things, site development approval from the City of Rochester and an air quality permit from the New Hampshire Air Resources Division. Furthermore, Wormser had secured property rights to the project site. It had also negotiated a steam sales contract with Spaulding Fibre. In addition, the PUC found that Wormser had demonstrated that the project design and construction planning had advanced to the stage where "not-to-exceed" construction quotations had been provided by reliable design and construction firms. The commission concluded the timeliness inquiry by adding that the financing arrangements had advanced to a stage where a rate order was warranted.

The second condition, eligibility, requires a demonstration that the project be viable over the term of the rate obligation. The commission specifically found that "Wormser has provided sufficient assurances that the project is economically viable if it

operates at the availability projected." Docket No. DR 86-1, Report and Second Supplemental Order No. 18,460, at 13. Although there had been some evidence of financial and technical uncertainties regarding the project, the PUC found that countervailing considerations minimized those uncertainties. Addressing PSNH's concern regarding the cost and availability of coal to Wormser, the PUC found specifically that the FBC technology was flexible and permitted conversion to other fuel sources with relative ease, as well as requiring a small supply of coal and emitting reduced sulfur emissions. In addition, Wormser had an offer from New England Agencies, Inc. for a twenty-year fuel contract. The PUC also found that Wormser had multi-fuel capacity, and a contract with Spaulding Fibre which would be binding on Spaulding's successors. These factors, in the opinion of the commission, give Wormser additional flexibility to meet adverse contingencies.

With respect to the project's economic viability, PSNH's claim that the assumed 88% availability factor is overly optimistic and presents an unacceptable financial risk to ratepayers was adequately addressed by the PUC. Indeed, the PUC was also concerned with the reliability of the prediction of that level of availability. Recognizing that failure to achieve an availability factor of 88% could present financial problems, and that the prediction might be unwarranted when viewed in the light of Wormser's prior experience with FBC technology, the PUC concluded that a rate structure reflecting a lesser degree of front-end loading would protect against any economic vulnerability. Thus, the PUC presented Wormser with the option of amending its petition to seek a rate structure consistent with its prior experience and reflecting rates producing a lower net present value.

In a further effort to minimize the uncertainties, the commission required additional financial protection. It conditioned its order on Wormser's creating a reserve fund to meet any cash deficiencies in the later years of the project. Furthermore, the PUC required Wormser to place a junior lien on the project in favor of PSNH.

■ In the end, the commission's conclusion that Wormser met the prerequisites for the granting of a long-term rate order was not clearly unreasonable on the evidence, and we so hold. As we are required to do, we defer to the judgment of the PUC regarding the measures it took to minimize the risks involved in developing this cogeneration project. *See Appeal of Conservation Law Foundation*, 127 N.H. at 616, 507 A.2d at 659. The steps taken by the PUC are, furthermore, in harmony with the overall policy of

PURPA and LEEPA to encourage the development of new technologies.

The last issue raised by PSNH relates to the PUC's subsequent decision in Order No. 18,576 to grant Wormser's amended rate petition. PSNH argues that the PUC did not have authority to approve the amended petition while this appeal was pending. In addition, PSNH challenges the commission's action on the due process ground that PSNH was not permitted an opportunity to be heard on the amended petition. Finally, PSNH argues that the order on the amended petition is fatally defective because the PUC provided no analysis of its findings to support its conclusions.

Wormser counters that the PUC, despite the appeal, is not prohibited from passing on collateral, subsidiary, or independent matters in order to preserve the status quo of the case. See *Rautenberg v. Munnis*, 107 N.H. 446, 448, 224 A.2d 232, 233 (1966). Wormser argues that the amended filing and subsequent order were merely preserving the status quo, and thus were within the commission's jurisdiction. On the due process issue, Wormser argues that PSNH is not entitled to a hearing on the amended petition because all of the evidence pertaining to the rate structure had been heard in the prior proceedings, and there were therefore no issues in dispute. See *Greenwald v. Whalen*, 609 F.2d 665, 669 (2d Cir. 1979).

■■ PSNH is correct in its assertion that perfection of an appeal vests exclusive jurisdiction in this court over those matters arising out of, and directly related to, the issues presented by the appeal. *Rautenberg v. Munnis, supra* at 447, 224 A.2d at 233. However, *Rautenberg* also recognized that the lower tribunal is not prohibited by the general rule from "passing on collateral, subsidiary or independent matters affecting the case (*New Castle v. Rand*, 101 N.H. 201) and the [agency] has adequate authority and jurisdiction to preserve the status quo." 107 N.H. at 448, 224 A.2d at 233 (citing *Exeter Realty Co. v. Buck*, 104 N.H. 199, 202, 182 A.2d 469, 471 (1962)). Despite PSNH's claim that the amended rate petition goes to the heart of its challenge to the PUC's authority to grant a long-term rate order based on DR 85-215, we are of the view that the order on the amended petition was a subsidiary matter designed to preserve the status quo and complete the record of the case. Moreover, Wormser had filed its amended petition before the appeal by PSNH was taken, and PSNH did not respond to the amended filing. The PUC acted properly under these circumstances in reviewing the amended petition and granting the rate order based on a finding that the amended filing was

consistent with the limitations set forth by the commission in Order No. 18,460.

On the due process issue, we are convinced that the amended filing presented no new issues for the PUC to explore, other than Wormser's compliance with the limitations on its rate request imposed by the commission in its original order. It is indeed axiomatic that due process guarantees apply to administrative agencies. *Appeal of Lathrop*, 122 N.H. 262, 265, 444 A.2d 505, 506 (1982). It is equally well-established that a fundamental precept of due process is an opportunity to be heard. *Riblet Tramway Co. v. Stickney*, 129 N.H. 140, 148, 523 A.2d 107, 112 (1987). However, due process does not require a hearing unless there is an issue in dispute to be decided. *See Greenwald v. Whalen supra; Fay v. Douds*, 172 F.2d 720, 725 (2d Cir. 1949). The earlier hearings fully explored the financial and technical issues. As a result of the prior hearings, the PUC permitted Wormser to amend its petition to conform to one of three more limited rate structures. There was no issue left to decide other than Wormser's compliance with the limited option.

Finally, on a related issue, PSNH argues that the PUC order granting the amended rate petition was fatally defective because the commission did not fully explain the reasons for its final decision. *See Appeal of Concord Natural Gas Corp.*, 121 N.H. at 693, 433 A.2d at 1296–97. Again, it is our view that the PUC had already set forth in detail the requirements for an amended rate petition, if Wormser chose to file. The parameters of a limited rate structure, and the reasons for delineating them, were given in the original order. The PUC's failure to explain again its reasons for the limited rate structure was not a fatal error. All that was required was a finding of compliance with the PUC's previous order.

In sum, we hold that the PUC was within its lawful authority under PURPA and LEEPA in issuing a front-end loaded, long-term rate order based on the DR 85-215 rates, even though those rates may not have reflected PSNH's projected avoided costs at the time of the rate order. We also hold that the PUC order was not clearly unreasonable, and that there was no error in the granting of the amended rate petition during the pendency of this appeal.

*Affirmed.*

SOUTER, J., did not sit; the others concurred.