MATANUSKA–SUSITNA BOROUGH SCHOOL DISTRICT, Matanuska–Susitna Borough, a Municipal Corporation, June Tull, Kenneth P. Fallon, Donald L. Moore, and Roy S. Carlson, Jr., individually as taxpayers of the Matanuska–Susitna Borough, Donald L. Moore, as par-

ent and next friend for Tyler J. Moore and Isaac D. Moore, minor school students, and Roy S. Carlson, Jr., as parent and next friend of Reave C. Carlson and Amber L. Carlson, minor school students, Appellants,

v.

STATE of Alaska, Steve Cowper, Governor of the State of Alaska, William G. Demmert, Commissioner, Alaska Department of Education, and the State of Alaska Department of Education, Appellees.

No. S–5513.

Supreme Court of Alaska.

Jan. 31, 1997.

---

Thomas F. Klinkner, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for Appellants.

LuAnn E.B. Weyhrauch, Special Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

The Matanuska–Susitna Borough (Borough), the Matanuska–Susitna School District (District), and several individual plaintiffs challenged Alaska public school funding laws, arguing that differences in treatment between regional educational attendance area (REAA) school districts [1] and city and borough school districts, and among the non-REAA districts, violated their right to equal protection of the law under the state constitution. The superior court dismissed the equal protection claims on summary judgment, awarded attorney's fees against the Borough and the District, and assessed costs against the Borough, the District, and the individual plaintiffs. We reverse the assessment of costs against the individual plaintiffs, but affirm the judgment in all other respects.

### II. FACTS AND PROCEEDINGS

The Borough, the District, and the individual plaintiffs filed suit against the State in late 1986, alleging, *inter alia*, that the state system of school funding violated their right to equal protection of the law under article I, section 1 of the Alaska Constitution. Ruling on partial cross-summary judgment motions, the superior court dismissed the equal protection claims of all plaintiffs. The court held that the Borough and the District had no equal protection rights.[2] The court found that the challenged laws, AS 14.11.100 and 14.17.025(a) & (d), did not deprive the individual plaintiffs of equal protection.

The parties stipulated to dismissal of the rest of the claims, and final judgment was entered. The superior court awarded attor-

---

1. Areas of the state that lie outside the boundaries of organized boroughs constitute a single, unorganized borough. AS 29.03.010. The unorganized borough is divided into regional education attendance areas, or REAAs. AS 14.08.031.

2. Boroughs are not entitled to equal protection under the Alaska Constitution. *Fairbanks N. Star Borough v. State*, 753 P.2d 1158, 1160 (Alaska 1988); *Kenai Peninsula Borough v. State, Dep't of Community and Regional Affairs*, 751 P.2d 14, 18–19 (Alaska 1988).

As we observed in *Kenai Peninsula Borough*, "[t]he purpose of the Alaska due process and equal protection clauses is to protect people from abuses of government, not to protect political subdivisions of the state from the actions of other units of state government." 751 P.2d at 18–19. Under this rationale, the District also lacks any equal protection rights, since it, like the Borough, is not a "person" entitled to equal protection. *See State ex rel. Brentwood School Dist. v. State Tax Comm'n*, 589 S.W.2d 613, 615 (Mo. 1979) (en banc) (school districts are not "persons" and may not charge the state with due process violations).

ney's fees of $20,000 against the Borough and the District, rejecting their claims of public interest litigant status. The court also awarded partial costs of $6,557.28 against the Borough, the District, and the individual plaintiffs.

The individual plaintiffs appeal the denial of their equal protection claims. The Borough and the District appeal the award of attorney's fees. All plaintiffs appeal the cost award.

## III. DISCUSSION

### A. Equal Protection

The individual plaintiffs claim that their interests as taxpayers and their children's interests in education are impaired by the state school funding laws, and that an insufficient nexus exists between the state interests that justify these laws and the disparate treatment the plaintiffs claim to receive under them.

### 1. The challenged funding laws

The individual plaintiffs challenge two school funding laws: AS 14.11.100(a),[3] concerning state aid for costs of school construction debt, and AS 14.17.025(a) & (d),[4] con-

**3. Sec. 14.11.100. State aid for costs of school construction debt.**

(a) During each fiscal year, the state shall allocate to a municipality that is a school district, the following sums:
....
(6) ... 70 percent of payments made by the municipality during the fiscal year for the retirement of principal and interest on outstanding bonds, notes, or other indebtedness authorized by the qualified voters of the municipality on or after April 30, 1993, to pay costs of school construction, additions to schools, and major rehabilitation projects that exceed $200,000....
(7) ... 70 percent of payments made by the municipality during the fiscal year for the retirement of principal and interest on outstanding bonds, notes, or other indebtedness authorized by the qualified voters of the municipality after March 31, 1990, but before April 30, 1993, to pay costs of school construction, additions to schools, and major rehabilitation projects.

**4. Sec. 14.17.025. Local contributions.**

(a) Local contributions to a city or borough school district shall include at least the lesser of

cerning the local contribution required when districts receive state aid for operating costs.

AS 14.11.100(a) provides for state reimbursement of payments made by boroughs and cities to retire the indebtedness they incur for school construction. Through this section, borough and city school districts recover a significant portion of their costs of school construction. REAAs are not eligible for this program.

On its face, section 100(a) would appear to benefit borough school districts, such as the plaintiffs' district, while denying REAAs a comparable benefit. The individual plaintiffs argue, however, that this section actually works to disadvantage them. For debts authorized after March 31, 1990, the section provides that the State will reimburse only seventy percent of the annual debt service costs incurred during the fiscal year of reimbursement. AS 14.11.100(a)(6), (7).[5] The individual plaintiffs find that this section disadvantages them by comparing it to a section of Title 14 that provides for aid through construction grants. Under AS 14.11.008(c), REAAs are only required to contribute two percent of project costs in order to receive state school construction grants.[6] The indi-

(1) the equivalent of a four mill levy on the full and true value of the taxable real and personal property in the district as of January 1 of the second preceding fiscal year ... or
(2) 35 percent of the district's basic need for the preceding fiscal year, as determined under AS 14.17.021(b).
....
(d) Local contributions are not required in a regional educational attendance area....

**5.** For debts authorized prior to March 31, 1990, the section provides for varying levels of reimbursement depending on the date of authorization. The level of reimbursement ranges from a low of eighty percent of annual debt service costs to a high of one hundred percent. AS 14.11.100(a)(1)—(5).

**6.** Borough and city school districts are required to provide from five to thirty-five percent. AS 14.11.008(b). The individual plaintiffs do not challenge the difference between the percentage required of borough and city districts under (b) and of REAAs under (c).

The required share may be waived by the commissioner if a district can make a required showing of hardship. AS 14.11.008(d).

vidual plaintiffs argue that AS 14.11.100(a) effectively creates two classes of students and taxpayers: (a) those in "municipal school districts, which receive 70% state funding for school construction under AS 14.11.100"; and (b) those in "REAAs, which receive 98% state funding for school construction under AS 14.11.005—14.11.019."

In addition to school construction aid in the form of grants and debt reimbursement, school districts also receive state aid to help cover their operating costs. AS 14.17.010–.056. A district receives its "basic need" less a "required local contribution" less ninety percent of "federal impact aid." AS 14.17.021(a). Basic need is computed by totalling the amount or "units" of teaching required and multiplying this figure by the dollar value per unit, which is adjusted for cost differences among districts. AS 14.17.021(b), .031, .051, .056. In a city or borough school district, the local contribution is the lesser of (1) the equivalent of a four mill tax—a tax of four-tenths of one percent—on all real and personal property, or (2) thirty-five percent of last year's basic need. AS 14.17.025(a). REAAs are not required to make a local contribution. AS 14.17.025(d).

The individual plaintiffs argue that the local contribution requirement establishes three classes of students and taxpayers: (a) those in districts contributing the four mill equivalent; (b) those in districts contributing thirty-five percent; and (c) those in REAA districts, which make no local contribution. They argue that AS 14.17.025(a) and (d) combine to deprive them of equal protection of law because subsection (a) requires contribution from their district, while subsection (d) does not require any contribution from REAAs. They also argue that subsection (a) itself disadvantages them relative to students and taxpayers in other city or borough districts. Districts with a high assessed property value per student will pay thirty-five percent of basic need and thereby avoid having to tax at the four mill rate, while districts like their own will be forced to tax at the four mill rate. The individual plaintiffs contend that this creates a situation in which the districts with "the greatest ability to provide local support to education" are precisely those of which "a lesser tax effort is required . . . than of any other municipal school district."

### 2. *Equal protection analysis under the Alaska Constitution*

 Article I, section 1 of the Alaska Constitution provides that all persons are "entitled to equal rights, opportunities, and protection under the law." In giving effect to our equal protection clause, we have employed a sliding scale approach to determine the level of scrutiny that is required in reviewing a challenged statute. *State v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 631 (Alaska 1989); *State v. Ostrosky*, 667 P.2d 1184, 1192–93 (Alaska 1983) *appeal dismissed*, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984). This approach involves a three-step process:

First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. The nature of this interest is the most important variable in fixing the appropriate level of review. . . . Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.

Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.

Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is constitutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer. If the purpose can

be accomplished by a less restrictive alternative, the classification will be invalidated. *Alaska Pacific Assur. Co. v. Brown,* 687 P.2d 264, 269–70 (Alaska 1984).

■ This court exercises its independent judgment in deciding equal protection claims. *State v. Anthony,* 810 P.2d 155, 157 (Alaska 1991); *Sonneman v. Knight,* 790 P.2d 702, 704 (Alaska 1990).

3. *The individual plaintiffs have failed to establish a foundation for an equal protection claim based on educational opportunity.*

■ The individual plaintiffs claim that the educational interests of their children are adversely affected by the local contribution to operating costs required of the Borough by AS 14.17.025(a). They assert that invalidating the statute would result in more funding for their children's schools, leading to a better education. They also assert that educational interests require the highest scrutiny.

Where there is no unequal treatment, there can be no violation of the right to equal protection of law. In the absence of any evidence of disparate treatment, there is no basis for an equal protection claim,[7] and we need not subject the challenged laws to sliding scale scrutiny.

The individual plaintiffs have failed to present any evidence arguably showing that the educational interests of their children have been disparately affected by the local contribution to operating costs required of the Borough by AS 14.17.025(a). As discussed above, the total money available to a district is set by a statutory formula: basic need less the required local contribution less ninety percent of federal impact aid. AS 14.17.021(a). Basic need itself is determined by a statutory formula. AS 14.17.021(b), .031, .051, .056. No evidence indicates that altering the amount a district contributes to basic need will alter the overall amount of funding available. As noted by the State, "[t]he funding level remains constant regardless of the source of the revenue."[8] Because the individual plaintiffs have failed to arguably show that disparities in the local contribution required of districts translate into disparities in the educational opportunities available to students, their education-based equal protection challenge to AS 14.17.025(a) was properly dismissed.

4. *The individual plaintiffs have failed to establish a foundation for an equal protection claim based on school construction aid.*

■ The individual plaintiffs also have failed to present any evidence suggesting that there actually is an overall disparity in state aid for school construction. While REAAs are only required to contribute two percent of the costs of school construction to receive a grant under AS 14.11.008(c), they do not enjoy the following advantages enjoyed by borough and city districts.

Borough and city districts not only receive construction grants, but also enjoy the benefit of having their school construction debt reimbursed under AS 14.11.100(a), a benefit of which REAAs are unable to avail them-

---

7. *See United States v. Roberts,* 915 F.2d 889, 891 (4th Cir.1990), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991) (to establish equal protection violation, plaintiff "must show that similarly situated persons are subject to disparate treatment"); *People in Interest of C.B.,* 740 P.2d 11, 17 (Colo.1987) ("threshold inquiry in any equal protection claim is whether persons who are in fact similarly situated are subjected to disparate treatment by governmental act"); *Wellman v. Department of Human Serv's,* 574 A.2d 879, 883 (Me.1990) ("The prohibition against denial of equal protection of the law to any person is implicated only when action by the state results in treatment of that person different than that given similarly situated individuals."); *Appeal of Marmac,* 130 N.H. 53, 534 A.2d 710, 713 (1987) ("first question in an equal protection analysis is whether the State action in question treats similarly situated persons differently"); *Cosro, Inc. v. Liquor Control Bd.,* 107 Wash.2d 754, 733 P.2d 539, 543 (1987) ("To show a violation of the equal protection clause, a party must first establish that the challenged act treats unequally two similarly situated classes of people.").

8. Nathaniel H. Cole, a consultant in education finance and management, affied that, in his professional opinion, spending per student among districts in Alaska "is as equitable as [in] any state's program I have examined" except Hawaii's, and that is because Hawaii "has but one state-operated school district, and therefore has no disparities between districts."

selves. Debt reimbursement is not a discretionary obligation on the part of the state, but is mandatory. AS 14.11.100(a). Thus, while borough and city districts can take advantage of both grants and debt reimbursement, REAAs can only take advantage of the former. Further, while borough and city districts can force school construction by issuing bonds, REAAs must await the pleasure of the legislature, for they cannot tax or exercise other local governmental powers. Alaska Const. art. X, § 2.[9] Finally, the law does not require borough and city districts to pursue debt financing. The Borough could opt to rely solely on grants instead, thereby avoiding AS 14.11.100(a) completely.

The individual plaintiffs have failed to show that the various laws providing state assistance for school construction arguably interact in such a way that the students and taxpayers of the Borough have been disadvantaged somehow relative to those residing in REAAs.[10] In the absence of any evidence arguably showing an overall disparity in benefits and burdens, we are left with little more than a challenge to a debt reimbursement program that is available to the individual plaintiffs' district, but unavailable to the REAAs themselves. We cannot see how the individual plaintiffs' district is disadvantaged relative to REAAs by having the option of participating in this program. The equal protection challenge to AS 14.11.100(a) therefore fails.

5. *The individual plaintiffs' taxation-based equal protection challenge to the required local contribution to operating costs fails because the State has established a substantial relationship between means and ends.*

The only equal protection argument left to be addressed is the individual plaintiffs' contention that the local contribution to operating costs required by AS 14.17.025(a) disparately affects their interests as taxpayers, relative both to taxpayers in REAAs, where no local contribution is required, and to taxpayers in the thirty-five percent districts.

The individual plaintiffs have not shown that they pay higher taxes as a result of the required local contribution, or that invalidating AS 14.17.025(a) would result in savings to them as taxpayers. AS 14.17.025(a) requires boroughs like the one in which the plaintiffs reside to contribute to operating costs at the four mill rate; it does not require them to actually meet their contribution through property taxes. The individual plaintiffs have presented evidence, however, that their borough's local contribution was the equivalent of a 5.69 mill tax levy.[11] Given this level of local contribution, it is arguable that the individual plaintiffs' interests as taxpayers are being impaired by the contribution requirement. Because of this, we will proceed with an equal protection analysis of this claim.

■ First, we must weigh the importance of the interests affected. Assuming that the individual plaintiffs' interests as taxpayers actually are impaired by the school funding laws, these interests are not interests afforded much weight under our equal protection analysis. "The interest involved here, freedom from disparate taxation, lies at the low end of the continuum of interests protected by the equal protection clause." *Atlantic Richfield Co. v. State*, 705 P.2d 418, 437 (Alaska 1985) (footnote omitted), *appeal dismissed*, 474 U.S. 1043, 106 S.Ct. 774, 88 L.Ed.2d 754 (1986).[12]

---

9. **Section 2. Local Government Powers.** All local government powers shall be vested in boroughs and cities. The State may delegate taxing powers to organized boroughs and cities only.

10. Indeed, the superior court had before it evidence indicating that, from 1981 to 1990, the State paid the Borough more in school construction costs per student than it paid the average REAA. During the same time period, all but three of the REAAs received less in legislative grants for school construction than the Borough did.

11. In addition to the local contribution required under AS 14.17.025(a), districts are free to provide limited additional local support for public education under AS 14.17.025(b).

12. As a general matter, economic interests are not considered interests of a high order in equal protection analysis. *State, Dep't of Revenue v. Cosio*, 858 P.2d 621, 629 (Alaska 1993); *Coghill v. Coghill*, 836 P.2d 921, 929 (Alaska 1992); *Anthony*, 810 P.2d at 158; *Sonneman*, 790 P.2d at 705; *Hilbers v. Municipality of Anchorage*, 611 P.2d 31, 40 (Alaska 1980). *But see Ensersch, 787*

■ Second, we must examine the purposes served by the challenged statute. Because the individual plaintiffs' interests affected lie "at the low end of the continuum," we need only examine whether the state's objectives were legitimate. *Id.; Alaska Pacific*, 687 P.2d at 269. The stated purpose of the public school foundation program that provides for operating cost aid is "to assure an equitable level of educational opportunities for those in attendance in the public schools of the state." AS 14.17.220. This purpose easily meets the required standard of legitimacy. Article VII, section 1 of the Alaska Constitution provides that "[t]he legislature shall by general law establish and maintain a system of public schools open to all children of the State...." In discussing this section, we have observed:

> This constitutional mandate for pervasive state authority in the field of education could not be more clear. First, the language is mandatory, not permissive. Second, the section not only requires that the legislature "establish" a school system, but also gives to that body the continuing obligation to "maintain" the system. Finally, the provision is unqualified; no other unit of government shares responsibility or authority. That the legislature has seen fit to delegate certain educational functions to local school boards in order that Alaska schools might be adapted to meet the varying conditions of different localities does not diminish this constitutionally mandated state control over education.

*Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971) (footnotes omitted). By enacting a law to ensure equitable educational opportunities across the state, the legislature acted in furtherance of this constitutional mandate.

■ In the third and final step of our equal protection analysis, we must evaluate the State's interest in the particular means employed to further its goals. Because the individual interests affected lie "at the low end of the sliding scale," we need only find a "fair and substantial relationship" between means and ends. *Anthony*, 810 P.2d at 159;

*Alaska Pacific*, 687 P.2d at 269–70; *see Coghill v. Coghill*, 836 P.2d 921, 929 (Alaska 1992).

As mentioned above, REAAs are constitutionally unable to tax. Alaska Const. art. X, § 2. The State argues that "[t]he statutory treatment of municipal districts and REAAs is warranted based on the constitutional differences between these two entities." The individual plaintiffs argue that the State itself could tax REAAs for REAA school expenses, since "[t]he legislature ... may exercise any power or function in an unorganized borough which the assembly may exercise in an organized borough." Alaska Const. art. X, § 6. They argue that the availability of this option of directly taxing REAAs for REAA school purposes undermines the State's justification for the disparate treatment inherent in the means chosen.

■ The plaintiffs demand more of the State than equal protection requires, however. At the low end of the sliding scale "a substantial relationship between means and ends is constitutionally adequate." *Alaska Pacific*, 687 P.2d at 269–70. "'[I]f relaxed scrutiny is indicated ... a greater degree of over/or underinclusiveness in the means-to-ends fit will be tolerated.'" *State Dep't of Revenue v. Cosio*, 858 P.2d 621, 629 (Alaska 1993) (quoting *Ostrosky*, 667 P.2d at 1193). Even if the legislature overcompensated for the unique constitutional limitations on REAAs when it opted to exempt them entirely from the local contribution requirement, the fit between the means it chose and the goal of the legislation is close enough to withstand the relaxed scrutiny applicable to this case.

In order to meet its goal of ensuring equitable educational opportunity across the state, the legislature had to find some means of accommodating the fact that REAAs cannot raise taxes on their own. The means it chose may not have been those most protective of taxing equality, but they do bear a substantial relationship to the goals of the legislation. The classifications relied upon meet the minimal requirement that they

P.2d at 632 ("right to engage in an economic endeavor within a particular industry is an 'im-portant' right for state equal protection purposes").

" 'rest upon some ground of difference having a fair and substantial relation to the object of the legislation.' " *Ostrosky,* 667 P.2d at 1193 (quoting *Isakson v. Rickey,* 550 P.2d 359, 362 (Alaska 1976)).[13]

Given the differences in constitutional status between REAAs and borough and city districts, we hold that the legislative decision to exempt REAAs from the local contribution requirement, while requiring contributions from borough districts, was substantially related to the legislature's goal of ensuring an equitable level of educational opportunity across the state. Therefore, the REAA exemption did not deprive the individual plaintiffs of equal protection under law.

■ The State justifies the thirty-five percent cap on the required local contribution from borough and city districts by observing that requiring a contribution equivalent to a four mill tax from all borough or city districts would force some districts to contribute an amount that would actually exceed their total basic need.[14] This, it is argued, would increase disparities in per pupil spending among districts, thereby defeating the goal of an equitable level of educational opportunity.[15] The individual plaintiffs argue that the thirty-five percent ceiling is "so overinclusive [that it] cannot

bear a 'fair and substantial relation' to the state interest that it serves." They suggest that a cap at one hundred percent of basic need would have avoided requiring a contribution in excess of basic need while bringing the applicable districts closer to the four mill contribution required of other districts.

Once again, the individual plaintiffs demand more of the State than equal protection requires. Under a one hundred percent cap, some districts would still be forced to contribute at a higher tax equivalent than others. Certain districts would still be paying less than the four mill equivalent, since that equivalent would exceed the cap. The legislature might have set the cap higher or lower; wherever it had set the cap, some taxpayers would have ended up residing in four mill districts while others reside in capped districts. Thus, different "classifications" of taxpayers would still have resulted. As discussed above, "a greater degree of over/or underinclusiveness in the means-to-ends fit will be tolerated" at the lower end of the equal protection scale. *Ostrosky,* 667 P.2d at 1193.

The thirty-five percent cap ensures that excessive local contributions will not be required of districts; it thereby protects

13. Further support for the legislature's decision not to tax REAAs for school purposes might be found in the unique limitations on the available tax base in many of the REAAs themselves.

 Michael W. Worley, tax assessor for the State, affied that the available tax base in REAAs is limited by a number of factors: the tax-exempt status of certain Native-owned lands, the widespread lack of ownership records, and the fact that property ownership is often poorly defined in these areas. He also stated that "[b]orough organization generally occurs when a tax base develops or is discovered in the area which is adequate to support local government and to yield, in addition, greater services than are otherwise provided by the state."

14. In particular, the State points to the North Slope Borough and the City of Valdez as two local governments that would be forced to contribute in excess of basic need.

15. The State also argues that paying the remaining sixty-five percent of basic need in the wealthiest districts furthers the goal of state authority and control over public education since, "as a

practical matter," this aid gives the State leverage over districts, allowing the State to have a greater say in setting standards. In briefing this asserted purpose, the State does not refer us to any legislative history or other authority that might indicate that one of the goals of capping the required local contribution at thirty-five percent was to maintain state leverage. Furthermore, this goal does not appear anywhere in the legislature's statement of purpose. AS 14.17.220.

 In *State v. Anthony,* we refused to consider one of the legislative purposes asserted by the State because we did not find any explicit indication in the legislative history that the asserted purpose was one of the purposes behind the act at issue. 810 P.2d at 159. While a "[c]lose examination of the statutory scheme will usually yield several concrete legislative purposes having a substantial basis in reality, even if these purposes are not specifically identified in a statutory purpose clause," *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1264–65 n. 39 (Alaska 1980), we see no reason to assume that one of the legislature's goals in capping the required local contribution was to ensure continued finan-

against increased funding inequities among districts and furthers the statutory purpose of equitable educational opportunity state-wide. Even if a one hundred percent cap might have accomplished this goal in a manner that would have treated taxpayers more equitably, the thirty-five percent cap still furthers the purpose of the statute. It provides the required fit and bears a substantial relationship to the legislative goals that underlie the statute.[16]

We hold that any disparate impact on taxpayers in four mill districts that results from the thirty-five percent cap in AS 14.17.025(a) does not rise to the level of an equal protection violation.

The opinions of courts in other jurisdictions that have decided equal protection challenges involving the disparate taxing of seemingly similarly situated people lend further support to our holding today.

In *Nordlinger v. Hahn*, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), the Supreme Court upheld California's Proposition 13, under which property was assessed at its 1975–76 market value unless adjusted to current market value due to a change in ownership or a substantial improvement of the property. *Id.* 505 U.S. at 4–6, 112 S.Ct. at 2329. Over time, this "acquisition-value" system created large disparities in the taxes paid by similarly situated property owners. Nordlinger was paying approximately five times the property tax paid by another homeowner in her neighborhood on a similar house and lot. *Id.* at 6–8, 112 S.Ct. at 2330.

The Court found two reasons supporting the California assessment system. First, "the state had a legitimate interest in local neighborhood preservation, continuity, and stability." *Id.* at 12, 112 S.Ct. at 2333. Second, "a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher

taxes as does an existing owner.... [A]n existing owner rationally may be thought to have vested expectations in his property or home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase." *Id.*

In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court examined Texas's system of school financing, which relied on local property taxes for a significant portion of each school's budget. Unlike in Alaska, school budgets in Texas were not equalized between districts. Using a higher tax rate, the poorest district generated only a fraction of the local support that the most affluent district did. *Id.* at 11–14, 93 S.Ct. at 1285–86. The Court rejected an equal protection challenge, holding that the local taxation system rationally furthered the legitimate state purpose of local control of school districts. *Id.* at 49–56, 93 S.Ct. at 1305–08.

Fourteen years before *Nordlinger*, the California Supreme Court itself upheld Proposition 13 against an equal protection challenge. *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978). The court found that the " 'acquisition value' approach to taxation finds reasonable support in a theory that the annual taxes which a property owner must pay should bear some rational relationship to the original cost of the property." *Id.* 149 Cal. Rptr. at 251, 583 P.2d at 1293. The court noted several provisions of the state constitution that indicated that property with equal current value need not be taxed equally.[17] *Id.* 149 Cal.Rptr. at 252, 583 P.2d at 1294.

In *Savage v. Munn*, 317 Or. 283, 856 P.2d 298 (1993), the Oregon Supreme Court addressed a challenge to an initiative which amended the Oregon Constitution to set limits on property taxes. If various taxing enti-

cial leverage over the districts. Thus, we will not consider this suggested purpose.

16. Furthermore, it is worth noting that under the thirty-five percent cap the wealthiest districts still pay for a higher percentage of basic need than any of the four mill equivalent districts do. Therefore, the cap does not seem to undermine the broader equitable purposes of the statute,

since the needier districts still have a greater percentage of their basic need paid for by the State than do the wealthier capped districts.

17. These included explicit contemplation of a standard other than fair market value and exemptions for various taxpayer classes such as veterans. *Id.* 149 Cal.Rptr. at 252, 583 P.2d at 1294.

ties subjected a property to total taxes over these limits, the taxes would be reduced proportionally. *Id.* 856 P.2d at 299–300. Savage challenged this amendment on federal equal protection grounds, postulating a scenario in which the initiative would result in different county taxes on identical property, depending on whether the property was inside or outside a city. *Id.* at 300 n. 3. The court cited to *Nordlinger* and held that the objective of limiting total taxes was a legitimate state interest and the tax limit chosen had a rational basis. *Id.* 856 P.2d at 304–05.

 Each of these cases was decided under the minimal federal equal protection standard of rational basis review. The minimal equal protection standard under the Alaska Constitution, the substantial relationship standard we have applied in this case, is stricter in its protection of individual rights than its federal counterpart. *Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1371 (Alaska 1987); *Erickson,* 574 P.2d at 11–12; *Isakson,* 550 P.2d at 362. We do not express any views as to whether these cases would have been decided the same way if they had been brought as equal protection challenges under the Alaska Constitution.

These cases from other jurisdictions are informative, however, insofar as they provide some indication of the latitude lawmakers are given in furthering public policy objectives even when the means chosen may happen to have severely disparate impacts on certain classes of taxpayers. In the case before us, the legislature was not only pursuing its own sense of public policy, but also was acting in furtherance of its constitutionally mandated duty to maintain and control a statewide system of public schools. Furthermore, the plaintiffs have not shown clearly that they have been disparately affected, as the plaintiffs in *Nordlinger* and *Rodriguez* did, or that any potentially disparate effect on them even remotely approaches the same degree of imbalance and severity of burden found constitutional in those cases.

For the various reasons discussed above, all of the individual plaintiffs' equal protection claims fail.

### B. *Attorney's Fees and Costs*

1. *The superior court did not abuse its discretion in awarding attorney's fees against the Borough and the District.*

 The superior court awarded attorney's fees of $20,000 against the Borough and the District. The court rejected their claims of public interest status, finding that they brought suit in order to increase the aid they receive or decrease the required local contribution. The Borough and District argue the award was error that should be reversed based on their claim to public interest litigant status.

This court has established four criteria for identifying public interest litigants:

(1) whether the case is designed to effectuate strong public policies; (2) whether, if the plaintiff succeeds, numerous people will benefit from the lawsuit; (3) whether only a private party could be expected to bring the suit; and (4) whether the litigant claiming public interest status would lack sufficient economic incentive to bring the lawsuit if it did not involve issues of general importance.

*Oceanview Homeowners Ass'n, Inc. v. Quadrant Constr. and Engineering,* 680 P.2d 793, 799 (Alaska 1984) (citing *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 222–23 (Alaska 1982)).

 The superior court's determination of public interest litigant status is reviewed for abuse of discretion. *Kenai Lumber,* 646 P.2d at 223; *Carney v. State Bd. of Fisheries,* 785 P.2d 544, 547 (Alaska 1990). Furthermore, this court has stated that, "any party challenging the superior court's decision in this regard has a heavy burden of persuasion." *Anchorage Daily News v. Anchorage School Dist.,* 803 P.2d 402, 405 (Alaska 1990).

The Borough and District claim that they meet all of the criteria. The State mainly disputes economic interest, although it briefly argues that the Borough and District do not meet the other criteria. We hold that the economic interest compelling this suit is substantial enough to defeat the Borough and District claim of public interest litigant status.

Economic interest need not take the form of damages. In *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293 (Alaska 1982), we denied public interest status to a church that sought declaratory and injunctive relief regarding a zoning restriction. We upheld the superior court's ruling, stating that: "Seward Chapel had a sufficient private incentive to challenge the city's zoning ordinance which removes this case from the purview of the 'public interest' exception to awards of attorney's fees." *Id.* at 1302.

In the case now before us, the Borough and District also stood to gain from bringing suit, either by increased state funding or decreased taxes. They had a substantial economic incentive for bringing suit against the State.

Both sides to this appeal cite *City of Valdez v. Copper Valley Electric Association, Inc.*, 740 P.2d 462, 466 (Alaska 1987), a case in which the Copper Valley Electric Association (CVEA) sued the City of Valdez, alleging a "wrongful withholding of payments which CVEA is allegedly entitled to receive directly from the state, and which should have been credited on the customer's bill, thus lowering the cost of electricity to the citizens of Valdez." *Id.* at 466. We noted "a good deal of self-interest at stake for CVEA," but noted as well that CVEA sought to effectuate public policy and CVEA's customers would have received benefits. *Id.* We also noted that "CVEA was probably in the best legal position to sue, since by statute it was CVEA which was to demonstrate eligibility and receive direct payments." *Id.* For these reasons, we held that CVEA was entitled to public interest litigant status. *Id.*

In the instant case, however, the Borough and the District were not "in the best legal position to sue," since they have no equal protection rights. Furthermore, the Borough and District had a substantial economic interest distinguishable from CVEA's; unlike the Borough and District, CVEA was required by law to pass along savings to its customers.

Where the sums at stake in a suit are large enough to prompt suit regardless of the public interest, public interest litigant status will be denied. *Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Ry. Co.*, 658 P.2d 776, 778 (Alaska 1983) (half a million dollars substantial economic motivation); *Thomas v. Bailey*, 611 P.2d 536, 539 n. 9 (Alaska 1980); *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 103 (Alaska 1974). State construction grants to the Borough totalled over $23 million from 1981–1990. State debt support to the Borough during this period totalled over $151 million.

The superior court did not abuse its discretion in denying the Borough and the District public interest litigant status due to their substantial economic interest in the action.

2. *The superior court did not abuse its discretion in awarding costs against the Borough and District, but it did abuse its discretion in awarding costs against the individual plaintiffs.*

The superior court awarded the State costs of $6,557.28. Of this, $5,500.00 was for the cost of preparing charts for use as summary judgment exhibits. The plaintiffs argue that this part of the cost award should be reversed, as "[e]xpert preparation costs are not allowed as costs of producing exhibits," citing Alaska Rule of Civil Procedure 79(b) and *CTA Architects of Alaska v. Active Erectors & Installers, Inc.*, 781 P.2d 1364, 1366 (Alaska 1989). The superior court read Civil Rule 79(b) and *CTA Architects* differently, however, and concluded that the exhibit preparation costs "probably were necessarily incurred in the action," and may therefore be allowed as costs.

In *CTA Architects*, the respondent argued that "expert fees incurred in preparing exhibits may be recovered as costs under Civil Rule 79," which allows costs for "the necessary expense of . . . producing exhibits." *Id.* at 1366. We disagreed, holding that "produce" did not mean "compose," but rather produce in the discovery sense. *Id.*

In concurrence, Justice Rabinowitz, joined by Justice Burke, agreed with the court's result, but noted that the "catchall" provision

of Rule 79(b) [18] might allow such costs in the proper case. *Id.* at 1367. Justice Rabinowitz suggested "that in certain cases it will be within the trial court's discretion to allow full exhibit preparation costs under Civil Rule 79(b). These costs will be justified to the extent that the court determines that they were 'necessar[y] ... to enable a party to secure some right.' Alaska R.Civ.P. 79(b)." *Id.* However, he noted that this route was limited by Alaska Administrative Rule 7, which had been interpreted to disallow recovery of expert preparation costs in most cases; only time spent testifying is recoverable. *Id.* at 1367–68.

The superior court found the concurrence persuasive and held that the cost issue depended on whether the expert's "services were more like those of an expert who was retained to prepare for and testify at trial on a material issue, but never did testify, or were services similar to sophisticated graphic artistry or other similar demonstrative skill necessary to help the trier of fact obtain a clear understanding of complicated issues."

■ We agree with the reasoning of the superior court, and hold that this case presents the type of situation foreseen in the concurrence to *CTA Architects*, namely, a situation in which it was within the trial court's discretion to allow full exhibit preparation costs because these costs were necessary to secure some right. While case law is clear that a party may not recover fees for an expert who does not testify,[19] these cases are decided under Administrative Rule 7(c) and Civil Rule 83. These rules concern the use of experts in the context of testimony. Use of an "expert" to help prepare necessary exhibits is an entirely different matter. Such costs fall under Civil Rule 79(b)'s "any other expenses necessarily incurred" rubric. While this general language has been held to be preempted by the more specific language

of Administrative Rule 7 and Civil Rule 83, *Miller v. Sears*, 636 P.2d 1183, 1195 (Alaska 1981), the preemption is inapplicable in the case at hand since the "expert" is not being used in the context of a witness. Finally, the list of costs in Civil Rule 79(b) is not exclusive.

■ While we hold that it was within the superior court's discretion to award full exhibit preparation costs, we conclude that the award of costs against the individual plaintiffs was an abuse of discretion. For the reasons discussed above, the Borough and District were not public interest litigants. These plaintiffs are therefore liable for costs in addition to attorney's fees. As to the individual plaintiffs, however, we hold that they have met the criteria for public interest litigant status, and that the award of costs against them was therefore inappropriate.

The individual plaintiffs have met the four *Oceanview* criteria, discussed above, for identifying public interest litigants. *See Oceanview*, 680 P.2d at 799. Of these criteria, it is particularly significant that the individual plaintiffs, unlike the Borough and the District, lacked a sufficient economic incentive to bring this suit. While the Borough and District stood to gain substantial economic advantages had they prevailed in this suit, the same cannot be said for the individual plaintiffs. Any economic benefits that they might have gained as taxpayers would have been so diffusely spread among the taxpayers of the Borough that it seems highly unlikely that any individual plaintiff would have had a sufficient personal incentive to bring suit. Indeed, it is unclear whether the individual plaintiffs even would have derived any economic benefit had they prevailed; as discussed above, the plaintiffs never really showed that they stood to gain as taxpayers,

---

18. The "catch-all" provision of Civil Rule 79(b) provides that

> In addition to the items allowed as costs by law and in these rules, a party shall be allowed any other expenses necessarily incurred in order to enable a party to secure some right accorded the party in the action or proceeding.

19. *CTA Architects*, 781 P.2d at 1367–68 (Rabinowitz, J., concurring); *Atlantic Richfield Co. v.*

*State*, 723 P.2d 1249, 1253 (Alaska 1986) ("A party may not recover costs for experts' preparation time nor any costs associated with the experts if they do not testify"); *Miller v. Sears*, 636 P.2d 1183, 1195 (Alaska 1981) ("fees for an expert who does not testify, or fees for necessary preparation time for an expert who does testify may not be recovered").

that they would enjoy lower taxes as a result of a favorable outcome in court.

Because the individual plaintiffs met the criteria for public interest litigant status, we reverse the superior court's award of costs against these plaintiffs, and remand the case for further proceedings. On remand, the court will need to determine whether the Borough and District should be liable for the entire award of costs, or whether the award should be reduced to reflect the fact that costs cannot be assessed against the individual plaintiffs.

## IV. CONCLUSION

We REVERSE the superior court's assessment of costs against the individual plaintiffs, and REMAND for a determination of whether the Borough and District should be liable for the full award of costs, or whether the award of costs should be reduced. We AFFIRM the judgment of the superior court in all other respects.

MOORE, C.J., not participating.

MATTHEWS, Justice, with whom RABINOWITZ, Justice, joins, concurring.

I concur in the result of today's opinion.

No serious claim is made in this case that substantially different levels of per pupil expenditures (adjusted for cost of living differences) exist among the various school districts of Alaska. Similarly, there is here no claim that funds available to any Alaska school district are insufficient to pay for a level of education which meets standards of minimal adequacy. Such claims have been brought in other states with varying degrees of success. *See, e.g., Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973); *Lujan v. Colorado State Bd. Of Educ.,* 649 P.2d 1005 (Colo.

1982); *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Reform Educational Financing Inequities Today (R.E.F.I.T.) v. Cuomo,* 86 N.Y.2d 279, 631 N.Y.S.2d 551, 655 N.E.2d 647 (1995); *Leandro v. State,* 122 N.C.App. 1, 468 S.E.2d 543, *rev. allowed,* 343 N.C. 512, 472 S.E.2d 14 (1996); *Fair School Finance Council of Oklahoma, Inc. v. State,* 746 P.2d 1135 (Okla. 1987); *Tennessee Small School Systems v. McWherter,* 851 S.W.2d 139 (Tenn.1993). Nothing in today's opinion, or in this concurrence, should be read as suggesting that such claims might not be maintainable, if supported factually, based on the equal rights [1] and public schools [2] clauses of the Alaska Constitution.

Two claims are presented in this case. The first is a claim of unequal State spending. Individual plaintiffs argue that the State spends more money on education in other districts than in their district. Thus plaintiffs' district must rely on local revenue sources, including taxes paid by plaintiffs, to partially fund the public schools. The second is a claim of inter-jurisdictional tax inequality. Individual taxpayers in one school district are complaining because the taxes they pay for their schools are greater than the taxes paid by other taxpayers in other districts for schools. For the reasons which I develop below, I do not think that either claim is cognizable.

Today's opinion treats the individual plaintiffs' claim of unequal State spending on its merits, holding that plaintiffs have not proven an overall disparity in benefits and burdens and thus have not shown a violation of the equal rights clause of the Alaska Constitution. Op. at 399–400. This may imply that if the plaintiffs had proven a substantial dis-

---

1. Article I, section 1 of the Alaska Constitution provides:

> This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

2. Article VII, section 1 of the Alaska Constitution provides:

> The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions. Schools and institutions so established shall be free from sectarian control. No money shall be paid from public funds for the direct benefit of any religious or other private educational institution.

parity in State spending, disadvantaging their school district, a valid equal rights claim might exist. I do not think that such an argument would be valid. In my view, no claim of unequal State spending for public facilities or activities is justiciable.[3] For example, the State may build roads in one area and not in another, may put a courthouse in one city and not in another, or put a job-training center in one community without providing a like center in another community, all without being answerable in court to claims of unconstitutionally unequal spending. The solution to unequal spending claims regarding public facilities and activities is exclusively political and legislative. This is to say, claims of this character pose a political question. *See Malone v. Meekins*, 650 P.2d 351, 356–57 (Alaska 1982). Political questions raise issues which are more properly dealt with by a coordinate branch of the State's government. *Id.* They cannot be answered by judges. *Abood v. Gorsuch*, 703 P.2d 1158, 1160 (Alaska 1985).

The individual plaintiffs also claim that they pay more in property taxes than taxpayers in more economically favored communities and than property owners in REAAs (who pay no property taxes). Again, I do not think that this is a cognizable equal rights claim. There is no inter-jurisdictional right to tax equality. The people of one local government will want certain levels of fire and police protection and zoning enforcement, while the people of another local government will want other levels, and the tax rates will reflect these differences. Likewise, different municipalities will decide to support their schools at different levels, and their tax rates will again be different.

The following language from *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 53–54, 93 S.Ct. 1278, 1307–08, 36 L.Ed.2d 16 (1973), speaks to this point:

> But any scheme of local taxation—indeed the very existence of identifiable local governmental units—requires the establishment of jurisdictional boundaries that are inevitably arbitrary. It is equally inevitable that some localities are going to be blessed with more taxable assets than others.* ...

Moreover, if local taxation for local expenditures were an unconstitutional method of providing for education then it might be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. ... It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live.

---

\* This Court has never doubted the propriety of maintaining political subdivisions within the States and has never found in the Equal Protection Clause any *per se* rule of "territorial uniformity." ...

The individual taxpayers' claim that they are being unfairly treated vis-a-vis property owners in REAAs is subject to the same observations. The State legislature acts as the local lawmaking body for unorganized areas such as REAAs. Further, if the State had a duty to tax property in REAAs, there would be no particular reason why the tax imposed should be measured by the rate paid by taxpayers in one particular municipality, rather than by lower or higher rates imposed by other municipalities. In my view the legislature can decide whether and how much to tax property in REAAs free from legally maintainable claims brought by taxpayers in other taxing jurisdictions that its decision is wrong. Here, as with State spending decisions, any available remedy must be pursued through majoritarian processes rather than through the courts.

---

3. To be distinguished are spending for individual benefits such as welfare programs or permanent fund dividends, which are subject to equal rights scrutiny. *Sonneman v. Knight*, 790 P.2d 702

(Alaska 1990); *Williams v. Zobel*, 619 P.2d 448 (Alaska 1980), *rev'd*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).