**CITY OF KOTZEBUE, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF CORRECTIONS, and State of Alaska, Department of Public Safety, Appellee.**

No. S–12149.

Supreme Court of Alaska.

Aug. 31, 2007.

Joseph W. Evans, Kotzebue City Attorney, Silverdale, Washington.

John K. Bodick, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

For a number of years, the City of Kotzebue operated the Kotzebue Regional Jail under a contract with the state. After being rebuffed by the state in its efforts to increase funding under the contract, the city opted to let the contract expire and then sued the state to recover the cost of operating the jail and transporting prisoners to court for arraignment. The main issue here is whether the Alaska departments of corrections and public safety owed a continuing duty to house and transport prisoners held in the Kotzebue jail after the contract expired. In all but one minor respect, we affirm the superior court's ruling on summary judgment that the state's duty to provide housing ceased when the contract expired but that it owed a continuing duty to transport prisoners to court.

## II. FACTS AND PROCEEDINGS

The operative facts are not in dispute. The department of corrections has administered Alaska's community jails program since fiscal year 1995. Community jails are local facilities used to hold prisoners for short periods of time between arrest and arraignment; during trials and while serving short sentences; pending transfer to larger correctional facilities; and when awaiting commitment for mental health and alcohol treatment. Built in 1988, the Kotzebue Regional Jail was operated by the city of Kotzebue under contract with the state as part of its community jail program for many years; the jail serves an area of approximately 35,000 square miles in the northwest region of Alaska.

In the years leading up to 2003, Kotzebue became convinced that its contract with the state was not fully covering the cost of operating the jail, thus forcing the city to subsidize the facility even though it housed prisoners charged with violating state laws. On June 6, 2003, after being denied additional funding, the city informed the department that it did not expect to renew the contract, that it planned to close the jail when the contract expired at the end of the month, and that its city council was in the process of adopting a resolution to that effect.

In response, on June 18, 2003, Commissioner of Corrections Marc S. Antrim advised Kotzebue City Manager Herman Reich that if the city executed the resolution closing the jail, it would have to "make arrangements to deliver offenders to a Department of Corrections facility." The nearest facility was in Nome, which is not connected to Kotzebue by road. Antrim further stated that, in his view, the department was "not responsible for an offender at the time of arrest" and was not obligated to take custody of a prisoner until a booking officer at a state correctional facility signed a remand slip accepting custody. Reich answered Antrim on June 24, challenging his understanding of state law.

According to Reich, under applicable law, "responsibility for pre-arraignment and post-arraignment transportation of state-charged prisoners lies with the Department of Corrections and the Department of Public Safety."

Meanwhile, on June 19, 2003, the Kotzebue City Council had passed a resolution prohibiting Reich from renewing the jail's contract and directing him to close the jail at midnight June 30, 2003, unless the state provided "full funding" for the next fiscal year beginning July 1. At midnight on June 30 the city closed the jail. No prisoners were being held there at the time.

In the early morning hours of July 2, 2003, the Kotzebue Police Department arrested an individual for a violation of state law. The Alaska State Troopers, a division of the department of public safety, refused to take custody of the prisoner, taking the position that their obligations toward prisoners did not begin until after arraignment. The troopers' refusal forced the city to re-open the jail on a limited basis.

In the ensuing two weeks, further discussions between the city and the department evidently took place. On July 17 City Attorney Joseph Evans spoke with Commissioner Antrim at a city council meeting. The next day Evans faxed a letter to Antrim to confirm that "[t]he City Council has reaffirmed its decision ... that the City of Kotzebue cannot and will not sign a [fiscal year 2004] contract for $589,000.00 to operate the Kotzebue Regional Jail." Insisting that the city's interpretation of state law was well grounded, Evans implored the departments of corrections and public safety to re-examine their positions declining to take responsibility for state-charged prisoners from arrest to arraignment. On the same day, the department of corrections' Deputy Director of Institutions, Mike Addington, sent a letter to City Manager Reich reaffirming that the department lacked "the resources to provide the City of Kotzebue with the additional funds to run the jail."

In a reply sent by fax on July 22, Reich challenged the department's decision to deny funding as "legally incorrect, politically inappropriate" and predicted that it would "most assuredly require the City to seek judicial redress." On the same day, City Attorney Evans signed the city's superior court complaint against the state. The complaint sought an order declaring the departments of corrections and public safety to be responsible for housing and transporting unarraigned prisoners arrested by the city, enjoining the departments to take custody of and transport such prisoners, and reimbursing the city for any costs and expenses it incurred in providing transportation or in operating the jail.

The parties' positions remained unchanged until October 10, 2003, when state troopers in Kotzebue abruptly changed course and resumed transporting prisoners from the jail to the Kotzebue courthouse for arraignment. Troopers in Kotzebue also began using temporary holding cells, or "cages," to house post-arraignment prisoners and prisoners awaiting arraignment who had been arrested by state troopers. The holding cells were managed exclusively by the department of public safety and were intended to hold prisoners for only a few hours until they could be transported to correctional facilities in Nome.

Monthly reports of activity at the Kotzebue Regional Jail for the period from July 2003 to October 2004 show that state-charged prisoners continued to be housed at the Kotzebue jail until their arraignments. Monthly arrest totals ranged from a low of seventeen in March 2004 to a high of fifty-two in September 2004.[1]

The state and city both moved for summary judgment. On August 30, 2004, Superior Court Judge Michael I. Jeffery granted summary judgment in favor of the city on the prisoner-custody issue, ruling that the department of corrections had a statutory duty to care for prisoners before their arraignment in locations where a state correctional facility existed. In the court's view, the "cages" maintained by the state in Kotzebue qualified as a correctional facility because the state accepted custody and held prisoners in the cages. The court reasoned that although the city had no viable claim for housing

---

1. Reports for later months are not in the record before this court.

expenses during the period between the jail's initial closure and the opening of the cages, it was entitled to reimbursement of its jail costs after the cages opened. The court also ruled that the department of public safety had an independent duty to transport Kotzebue prisoners to court for arraignment; in the court's view, the duty began after the troopers installed the cages to hold prisoners. The court thus awarded the city reimbursement for the costs it incurred in transporting prisoners to arraignment between the opening date of the cages and October 10, 2003—the date when state troopers voluntarily resumed transporting all Kotzebue prisoners to court.

In issuing its initial summary judgment ruling, the court mistakenly believed that the cages built by the troopers had been operated by the department of corrections. Soon after the ruling, the state moved for reconsideration, pointing out that the cages had been maintained by the department of public safety without any involvement by the department of corrections, so they did not qualify as correctional facilities. Based on this clarification, the court granted reconsideration and issued a revised summary judgment order, ruling that because the department of public safety's cages were not a state correctional facility, the city had no right to be reimbursed for housing prisoners at the Kotzebue jail even after the cages opened. The court nonetheless broadened its original ruling concerning the department of public safety's independent statutory duty to transport prisoners from the Kotzebue jail to court for arraignment. The court ruled that, even in the absence of a local correctional facility, this duty applied to all state-charged prisoners held in Kotzebue by the police. The superior court thus ordered that the city be reimbursed for all transportation costs it incurred from July 1 to October 10, 2003.

In entering its final judgment, the superior court ruled that the state was the prevailing party in the case and denied the city's request for public-interest litigant status, finding that it had "ample economic incentive" to bring the lawsuit. Accordingly, the court ordered the city to pay a portion of the state's attorney's fees.

The city then filed this appeal.[2]

## III. STANDARD OF REVIEW

We review a trial court's order granting summary judgment independently[3] and uphold the judgment if we conclude that the record presents no genuine issues of material fact and that the moving party was entitled to judgment on the law applicable to the established facts.[4] We similarly review questions of statutory interpretation independently, adopting the interpretation "most persuasive in light of precedent, reason and policy."[5]

## IV. DISCUSSION

### A. The City's Claim Against the Department of Corrections for Reimbursement of Housing Expenses

The city argues that the Alaska Constitution and Alaska Statutes require the state to take custody of and care for pre-arraignment prisoners arrested for violating state law by Kotzebue police. It contends that this obligation arises under article I, section 12 of the Alaska Constitution and AS 33.30.011(1).

Article I, section 12 addresses criminal administration, providing in relevant part: "Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the

---

**2.** The city and state eventually reached a new agreement on funding for the Kotzebue jail in the spring of 2005, about six months after the superior court issued its summary judgment order. The agreement applied prospectively and did not resolve the reimbursement issues raised in the present appeal.

**3.** *Schmitz v. Yukon–Koyukuk Sch. Dist.,* 147 P.3d 720, 724 (Alaska 2006).

**4.** *Ganz v. Alaska Airlines, Inc.,* 963 P.2d 1015, 1017 (Alaska 1998).

**5.** *Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994) (quoting *Ford v. Municipality of Anchorage,* 813 P.2d 654, 655 (Alaska 1991)).

principle of reformation." [6] The city asserts that this language "places responsibility for Alaska's criminal justice system on the State of Alaska." It specifically contends that the language makes the department "responsible for custody of state-charged offenders," citing a footnote from *State v. Chaney*[7] to support this assertion.

But neither the constitutional provision nor the *Chaney* footnote supports the city's position. Article I, section 12 describes the general goals that Alaska's criminal justice system must strive to attain. It addresses the criminal justice system as a whole and does not assign responsibility to any particular agencies within that system for housing city-arrested prisoners before arraignment.

Likewise, the city's reliance on *State v. Chaney* is unavailing. *Chaney* dealt with issues of criminal sentencing[8] and did not purport to address the central issue presented here: responsibility for housing and transporting unarraigned prisoners. Moreover, the *Chaney* footnote lends scant support to the city's constitutional theory; it simply states the general proposition that "[o]peration of our system of penal administration in Alaska is dependent upon a properly staffed and functioning [Department] of Corrections which has, in addition to probation and parole functions, the responsibility for treatment, rehabilitation, and custody of incarcerated offenders." [9] Nothing in this language refers to individuals who have been arrested but not yet arraigned, nor does it purport to define the precise scope of the department's responsibility for arrested persons who have not yet been committed to state custody.

The city's argument also relies heavily on AS 33.30.011(1), which broadly defines the duties of the commissioner of corrections with respect to correctional facilities. In relevant part, the provision directs the commissioner to

establish, maintain, operate, and control correctional facilities suitable for the custody, care, and discipline of persons charged or convicted of offenses against the state or held under authority of state law.[10]

Because Kotzebue police officers make arrests only for violations of state law, the city reasons, this provision's reference to "persons ... held under authority of state law" requires the commissioner to provide correctional facilities for every individual arrested by the Kotzebue police.

But in directing the commissioner to "establish, maintain, operate, and control correctional facilities" that are "suitable" for such prisoners, the statute hardly implies a responsibility extending to individual prisoners or specific categories of prisoners. More important, the city's contention that this provision sets out "specific, unequivocal dictates" largely ignores a companion provision, AS 33.30.071(b), which defines the events that trigger the department's duty to provide suitable prison facilities. This provision specifies that "[t]he responsibility of the commissioner under AS 33.30.011 begins when a prisoner is accepted into the commissioner's custody or admitted into a correctional facility." [11]

Under subsection .071(b), then, the duties described in AS 33.30.011 "begin" only "when a prisoner is accepted into the commissioner's custody or admitted into a correctional facility." [12] The first stated trigger of the duty—being "accepted into the commissioner's custody"—is not defined by statute or regulation. The superior court plausibly viewed this phrase as a reference to prisoners who are committed by a court to the department's custody but have not yet arrived at a correctional facility.[13] So construed, this provision has no relevance here.

---

**6.** Alaska Const. art. I, § 12.

**7.** *State v. Chaney,* 477 P.2d 441 (Alaska 1970).

**8.** *Id.* at 441–42.

**9.** *Id.* at 447 n. 26.

**10.** AS 33.30.011(1).

**11.** AS 33.30.071(b).

**12.** *Id.*

**13.** Specifically, the court based its theory on language in a pre–1995 version of AS 33.30.071(a). The former version stated:

[T]he commissioner ... shall provide for the custody, care, and discipline of prisoners pend-

The second triggering condition set out in subsection .071(b) is admission to a "correctional facility." Alaska Statute 33.30.901 defines "correctional facility" to mean "a prison, jail, camp, farm, half-way house, group home, or other placement designated by the commissioner for the custody, care, and discipline of prisoners." [14] Under the department of corrections' regulations, admission to a correctional facility is governed by 22 Alaska Administrative Code (AAC) 05.020; at the time the Kotzebue jail closed, this regulation allowed arresting officers to admit prisoners to a correctional facility by either producing commitment papers from a court or executing a remand-to-custody order in the presence of booking staff.[15]

When read in conjunction with these provisions, as it must be,[16] AS 33.30.071(b) can be seen as triggering the department's responsibility to provide for suitable custody of a prisoner when an arresting officer delivers a state-charged prisoner (together with a properly executed "remand-to-custody" form) to a booking officer at any "jail" that has been "designated by the commissioner for the custody, care, and discipline of prisoners." [17]

This language suggests that the commissioner must specifically designate a jail as a suitable place for housing prisoners before it can qualify as a "correctional facility." The need for a specific designation also finds support in the history of AS 33.30.011(1) and AS 33.30.071. Alaska Statute 33.30.071(b) specifically refers to the duties set out in subsection .011(1). As already mentioned, subsection .011(1) broadly directs the commissioner to

> establish, maintain, operate, and control correctional facilities suitable for the custody, care, and discipline of persons charged or convicted of offenses against the state or held under authority of state law.[18]

Subsection .071(b) elaborates on subsection .011(1) by making it clear that the commissioner's responsibility to carry out these duties "begins when a prisoner is accepted into the commissioner's custody or admitted into a correctional facility." [19]

Before the current version of AS 33.30.071(b) was enacted in 1995,[20] subsections .071(a) and (b) both addressed the custodial duties established under AS 33.30.011(1), but only insofar as these duties applied during the early stages of custody;

---

ing arraignment *commitment by a court to the custody of the commissioner of corrections*, or admission to a state correctional facility.
Ch. 88, § 6, SLA 1986 (emphasis added). The legislature amended this subsection in 1995 to read:
> The commissioner is not responsible for providing custody, care, and discipline for a person detained under AS 47.30.705 and AS 47.37.170 unless the person is admitted into a state correctional facility.
Ch. 92, § 1, SLA 1995.

**14.** AS 33.30.901(4). The definition of "correctional facility" set out in subsection .901(4) also specifies that "a 'state correctional facility' means a correctional facility owned or run by the state." *Id.*

**15.** Former 22 AAC 05.020. In September 2004 the department revised this regulation on an emergency basis to clarify that prisoners can be remanded only to correctional facilities that the commissioner of corrections has designated as suitable for that purpose. *See* Emergency Regulation, Alaska Admin. Reg. 171 (Oct. 2004) (effective Sept. 3, 2004) (amending 22 AAC 05.020). We assume for the sake of deciding this appeal that the earlier version of the regulation governs the city's reimbursement claim.

**16.** As we have previously observed, when trying to determine the meaning of a statute, courts must look not only to the particular language at issue but also to the "language and design of the statute as a whole." *FDIC v. Laidlaw Transit, Inc.*, 21 P.3d 344, 351 (Alaska 2001) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)); 2A Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION § 46:05 (6th ed. 2000) ("'[E]ach part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed.'") (footnote omitted). We have likewise emphasized that "[w]hen a statute or regulation is part of a larger framework or regulatory scheme, even a seemingly unambiguous statute must be interpreted in light of the other portions of the regulatory whole." *FDIC*, 21 P.3d at 351 (quoting *Millman v. State*, 841 P.2d 190, 194 (Alaska App.1992)) (alteration in original).

**17.** AS 33.30.901(4).

**18.** AS 33.30.011(1).

**19.** AS 33.30.071(b).

**20.** *See* ch. 92, § 2, SLA 1995.

unlike the current provision, the earlier version of AS 33.30.071 assigned these duties to the commissioner of public safety rather than the commissioner of corrections. Subsections .071(a) and (b) formerly provided:

(a) Notwithstanding AS 33.30.011(1), the commissioner of public safety shall provide for the custody, care, and discipline of prisoners pending arraignment, commitment by a court to the custody of the commissioner of corrections, or admission to a state correctional facility. . . .

(b) The responsibility of the commissioner of public safety under (a) of this section does not begin until a prisoner is accepted into the custody of the commissioner of public safety, or admitted into a correctional facility or other facility designed for holding prisoners, and the commissioner of public safety is notified of the acceptance or admission.[21]

The legislature amended section .071 in 1995; the amendment shifted responsibility for early custody of prisoners from the commissioner of public safety to the commissioner of corrections.[22] In addition, the amendment changed the scope of the duty.[23] Whereas the earlier version required the commissioner of public safety to provide for prisoners "pending arraignment, commitment by a court to the custody of the commissioner of corrections, or admission to a state correctional facility"[24] and further specified that this duty began when the commissioner accepted the prisoner into custody,[25] the amended form of section .071 dropped all mention of responsibility for pris-

oners "pending arraignment" and merely imposed responsibility on the commissioner of corrections beginning "when a prisoner is accepted into the commissioner's custody or admitted into a correctional facility."[26]

Although the city downplays the significance of omitting the earlier reference to custody "pending arraignment," we agree with the state that the omission indicates that the 1995 legislature did not intend to make the commissioner categorically responsible for all prisoners held on state charges "pending arraignment." This evidence of legislative intent reinforces the appropriateness of interpreting subsection .071(b) as triggering the commissioner's custodial responsibilities under AS 33.30.011(1) only upon a prisoner's remand to a jail that has been "designated by the commissioner for the custody, care, and discipline of prisoners."[27]

The Kotzebue jail necessarily met this designation requirement before its state contract expired.[28] The crucial question here, then, is whether the jail continued to be a "designated" place "for the custody, care, and discipline of prisoners"—and thus continued to qualify as a "correctional facility" to which prisoners arrested for state offenses could be remanded—after the city's contract with the state expired at midnight on June 30, 2003.

As already noted, the superior court ultimately found that the Kotzebue jail ceased to be a "correctional facility" as of July 1, 2003, so that the department had no duty to take custody of any unarraigned city prisoners as

21. Ch. 88, § 6, SLA 1986.

22. *See* Ch. 92, §§ 1–2, SLA 1995.

23. *Id.*

24. Ch. 88, § 6, SLA 1986.

25. *Id.*

26. *See* AS 33.30.071.

27. AS 33.30.901(4).

28. Under the department's regulations, "a 'contract facility' means a correctional facility provided to the department of corrections by agreement under AS 33.30.031." Under AS

33.30.901(4), "facility" and "correctional facility" have identical meanings: " 'correctional facility' or 'facility' means a prison, jail, camp, farm, half-way house, group home, or other placement designated by the commissioner for the custody, care, and discipline of prisoners; a 'state correctional facility' means a correctional facility owned or run by the state." Alaska Statute 33.30.031 broadly authorizes the commissioner of corrections to enter into various kinds of contracts for facilities providing custody and care to Alaska prisoners. It is undisputed here that, before closing, the Kotzebue jail was provided to the department of corrections by a contract entered under AS 33.30.031. In establishing the jail as a "contract facility" under the department's regulations, then, the commissioner necessarily designated it as a "correctional facility" under AS 33.30.901(4).

of that date. In reaching this conclusion, the court essentially equated the existence of a valid contract to run the Kotzebue jail with the jail's status as a "correctional facility" as defined by statute.[29] But the commissioner's power to enter into contracts for confinement and care of prisoners—a power established under AS 33.30.031[30]—is not necessarily coextensive with the commissioner's authority to designate "suitable" placements "for the custody, care, and discipline of prisoners"— an authority implicitly encompassed in AS 33.30.011(1)'s list of the commissioner's duties and expressly recognized in AS 33.30.901(4)'s definition of a "correctional facility" or "facility."

■ We have already observed that a contract allowing a regional jail to operate as a correctional facility suffices to designate the jail as a suitable place to house prisoners awaiting arraignment. Yet it hardly follows from this that a contract is a necessary ingredient of a designation. Nor does the state cite any provision of law or legal authority supporting the conclusion that a lapse in a jail's contractual arrangements with the department necessarily equates to a withdrawal of designation and automatically nullifies the jail's status as a designated facility. The commissioner's powers to enter into contracts and designate suitable placements for prisoners may well overlap to a considerable extent, but they arise from independent statutory sources and do not necessarily merge.

Here, the limited evidence in the record on summary judgment fails to establish that the city's unilateral resolution to close the jail at the moment its longstanding contract expired automatically resulted in withdrawing the commissioner's designation of the jail as a suitable place to remand prisoners. The power of designation belongs to the commissioner, not the city, and the portions of the contract quoted in the appellate record do not address the topic of designation.[31]

Correspondence between the parties undeniably shows that both sides used the contract's impending expiration date as a bargaining chip to encourage the opposing party to relax its demands regarding the contract's renewal. For example, on June 6, 2003, City Manager Reich evidently sent Commissioner Antrim a letter warning that the city expected to close the jail at the end of the month if the department refused to increase its contractual payments. Reich's letter was accompanied by a copy of the city council's pending resolution proposing to direct Reich to close the jail and a copy of a memo from City Attorney Evans to Kotzebue Police Chief Ed Weibl discussing alternative arrangements in the event of closure. Commissioner Antrim responded on June 18, predicting that the city's proposed decision would cause it to suffer "significant adverse impacts." The commissioner disputed Evans's legal position and emphasized that the department was "still prepared to provide $589,000 in funds through the Community Jails Program to assist the City of Kotzebue." Relying on his view of the law, the commissioner also argued that, "[s]hould the City of Kotzebue execute its resolution to close the city jail, your police department will have to make arrangements to deliver offenders to a Department of Corrections facility" and would "be placed in the logistically unenviable position of transporting its arrestees to a state operated correctional facility."

Nothing in this exchange amounted to an official notice of withdrawal of the commissioner's designation. Although the parties advanced escalating threats in attempting to negotiate a renewed contract, they took no definitive step to end the jail's use as a suitable holding place for persons arrested by the Kotzebue police. As already noted, the contract's expiration and the city's unilateral action of closing the jail did not by themselves withdraw the commissioner's designation. Two days after the contract ex-

---

**29.** In granting the state's motion for reconsideration, the court stated: "Once the contract ended, the state Department of Corrections had exercised its discretion to end its involvement in the facility. Therefore, no state correctional facility existed in Kotzebue once the contractual relationship ended in 2003."

**30.** *See* AS 33.30.031.

**31.** Although the parties quote various passages from the city's contract with the department, the contract itself does not appear to be part of the record before this court.

pired, when the city reopened the jail, the Alaska State Troopers formally declined to transport prisoners from the jail to the court for arraignment. But this action was based on the department of public safety's belief that it lacked statutory responsibility for transporting prisoners, not on the department of corrections' withdrawal of designation.

On the record before us, it appears that the first official communication notifying the city that the commissioner of corrections had actually decided to end the jail's designation as a suitable place for holding prisoners arrested by the Kotzebue police occurred on July 18, 2003, when the department of corrections' Director of Institutions, Mike Addington, sent City Manager Reich a letter declaring that the department would make no additional funding available to the jail. That same day, City Attorney Evans sent a letter by fax to Commissioner Antrim, reaffirming the city's decision not to sign the department's proposed fiscal year 2004 contract. Division Director Addington's letter to Reich expressed Addington's "respect [for] the decision of the Kotzebue City Council not to sign the [fiscal year 2004] contract" but went on to confirm the department's decision that "we do not have the resources to provide the City of Kotzebue with the additional funds to run the jail."

As of July 18, then, the city unquestionably received formal notice that the department had actually withdrawn authorization for prisoners to be placed at the Kotzebue jail, thereby effectively ending the jail's designation as a correctional facility. Because the record reveals no actual withdrawal of designation until July 18, we find no basis for concluding that the department of corrections was entitled to summary judgment as a matter of law on the issue of reimbursement for any housing costs incurred by the city before that date.

Based on our conclusion that the Kotzebue jail ceased to be a "correctional facility" as of July 18, 2003, we must vacate the superior court's summary judgment order on this point and remand for modification of the judgment to the limited extent that it summarily denies the city's housing-reimburse-ment claim for the period between July 1 and July 18. Conversely, we affirm the court's order denying reimbursement of housing expenses from July 18 forward.

**B. The City's Claim Against the Department of Public Safety for Reimbursement of Transportation Expenses**

The superior court viewed the city's motion for summary judgment as including a request for reimbursement of the city's costs in transporting city-arrested prisoners to court for arraignment from July 1, 2003, through October 10, 2003, when the troopers resumed handling the task of transportation. The court granted the city summary judgment on this issue, concluding that "[t]he Department of Public Safety has the statutory duty to provide or arrange for transport of prisoners to court for arraignment within Kotzebue." Relying on its finding of this general obligation, the court concluded that the city was entitled to reimbursement for all prisoner transportation costs it incurred from July 1 to October 10, 2003.

On appeal, the city requests this court to direct the superior court to issue an even broader order, prospectively "requiring the State of Alaska to fulfill its constitutional and statutory obligations for the … escort of pre-arraignment state-charged prisoners." But the state has not appealed the superior court's order of reimbursement; nor has it disputed the conclusion of law underlying the court's order. In effect, then, the city prevailed below in establishing the department's duty to transport prisoners within Kotzebue; the superior court's ruling on the point is undisputed; and, as the law of the case, that ruling will be binding on the parties in their future handling of prisoners held by the city in Kotzebue. Under these circumstances, we see no reason to require a broader order addressing the department of public safety's future handling of Kotzebue prisoners. And to the extent that the order requested by the city seeks to control the department's future conduct in other communities, we think that the city has failed to establish any present controversy that would make its request ripe for review. Accordingly, we decline to ad-

dress the city's request to direct the superior court to issue a broader order.

## C. Attorney's Fees

After the superior court issued its rulings on summary judgment, the state moved for reasonable attorney's fees and costs under Alaska Civil Rule 82, asserting that it was the prevailing party in the action. The city opposed the motion, insisting that it should be exempted from having to pay fees because its claims fell within the public-interest exception to Rule 82. The superior court rejected this argument and granted the state's motion for costs and fees, ruling that the city failed to qualify as a public-interest litigant because it had ample economic incentive to pursue the issues raised in the litigation, regardless of whether those issues raised matters of general public concern. Accordingly, the court ordered the city to pay the state $4,400 in attorney's fees.

The city challenges the superior court's order awarding fees, arguing that even if the city does not win on the merits of its appeal, the fee award should be vacated on remand because the city's action falls under the public-interest exception to Rule 82.[32] We review a superior court's determination of a party's qualifications as a public-interest litigant for abuse of discretion.[33]

■ We have identified four factors that courts must consider in deciding whether a party qualifies as a public-interest litigant:

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

(4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance? [34]

A party seeking public-interest-litigant status must establish that it meets each of these elements.[35]

■ The superior court centered its ruling on the fourth element, which required the city to establish that it would have lacked economic incentive sufficient to pursue this case if its claims had raised no issue of general importance. In *Eyak Traditional Elders Council v. Sherstone, Inc.*, we explained this factor's rationale:

If a party possesses a sufficient economic incentive to sue, there is less need to fear that the potential burden of an attorney's fee award would deter the plaintiff from pursuing beneficial litigation.[36]

Under *Eyak*, the fact that a litigant seeks monetary relief is not by itself conclusive.[37] Rather, the court must look to the facts of the case to determine the litigant's primary motivation for filing suit.[38]

■ Our decisions addressing this element illustrate how we have applied it in a variety of situations. For instance, we have held that claims dealing with subsistence use of natural resources qualify for public-interest status.[39] We have also accorded public-interest-litigant status to a homeowners group

32. In 2003, the legislature abrogated the general public-interest-litigation exception set out in Civil Rule 82. *See* Ch. 86, § 3, SLA 2003 (codified as AS 09.68.040(c)). Because the city filed its claim in this case before the effective date of the new legislation, the claim was governed by the original provisions of Rule 82. *Id.*

33. *Koyukuk River Tribal Task Force on Moose Mgmt. v. Rue*, 63 P.3d 1019, 1020 (Alaska 2003) (citing *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991)).

34. *Rue*, 63 P.3d at 1020–21.

35. *Cabana v. Kenai Peninsula Borough*, 21 P.3d 833, 837 (Alaska 2001).

36. *Eyak Traditional Elders Council v. Sherstone, Inc.*, 904 P.2d 420, 425–26 (Alaska 1995).

37. *Id.* at 426; *see also Girves v. Kenai Peninsula Borough*, 536 P.2d 1221, 1227 (Alaska 1975).

38. *Eyak Traditional Elders Council*, 904 P.2d at 426; *see also Abbott v. Kodiak Island Borough Assembly*, 899 P.2d 922, 924–25 (Alaska 1995).

39. *Rue*, 63 P.3d at 1021; *Alaska Survival v. State, Dep't of Natural Res.*, 723 P.2d 1281, 1292 (Alaska 1986); *see also Gwich'in Steering Comm. v. State, Office of the Governor*, 10 P.3d 572, 585 (Alaska 2000).

that attempted to curtail use of a private airstrip, noting that the group's "consistent emphasis on health and safety to the virtual exclusion of economic concerns" indicated that its action "was designed to vindicate a strong public policy" and that the group "would not have had 'sufficient economic incentive to bring the lawsuit even if it involved only narrow issues lacking general importance.' "[40]

By contrast, we have generally declined to find public-interest-litigant status when employees have sued for increased salaries or reinstatement to their jobs; in these cases we have emphasized that the prospect of a job or an increase in salary usually provides a sufficient economic incentive to motivate the suit.[41] Even more to the point, in an action for increased funding brought against the state by a borough and a local school district, we approved an award of fees against the borough and the district.[42] We found no abuse of discretion in the trial court's order denying them public-interest status, because both stood to gain financially from the funding increases they sought.[43] We emphasized that "[w]here the sums at stake in a suit are large enough to prompt suit regardless of the public interest, public[-]interest litigant status will be denied."[44]

Here, the city sought reimbursement for hundreds of thousands of dollars in jail-operation costs. As the superior court aptly noted, "[t]he effort to obtain reimbursement for a substantial amount of money put[s] the City in a very different category than a plaintiff such as a homeowners association" suing over health and safety concerns.[45] Because of the city's strong economic interest in the action at issue here, we hold that the superior court did not abuse its discretion in denying public-interest-litigant status and in awarding fees against the city under Rule 82.

## V. CONCLUSION

For these reasons, we REMAND this case to the superior court with directions to enter a modified judgment reflecting our holding that the Department of Corrections' obligation to pay housing costs to the city ended on July 18 rather than July 1, 2003.[46] In all other respects, we AFFIRM the superior court's judgment.

**40.** *Oceanview Homeowners Ass'n v. Quadrant Constr. & Eng'g,* 680 P.2d 793, 799 (Alaska 1984).

**41.** *See Municipality of Anchorage v. Citizens for Representative Governance,* 880 P.2d 1058, 1062–63 (Alaska 1994) (citing cases).

**42.** *Matanuska–Susitna Borough Sch. Dist. v. State,* 931 P.2d 391, 403 (Alaska 1997).

**43.** *Id.* at 403.

**44.** *Id.*

**45.** *See Oceanview Homeowners Ass'n,* 680 P.2d at 799.

**46.** On remand, if the issue is raised, the superior court will also be authorized to reexamine its original ruling as to which party prevailed.